[Crim. No. 3395.   Second Appellate District, Division One.—October 10, 1940.]

THE PEOPLE, Respondent, v. ARTURO AURELIO PINEDA, Appellant.

John Oliver for Appellant.

Earl Warren, Attorney-General, and Gilbert F. Nelson, Deputy Attorney-General, for Respondent.

YORK, P. J.—Appellant was charged in an information containing two counts with assault with intent to commit murder and with the crime of burglary. The jury returned its verdict finding appellant guilty as charged, and also found that he was armed at the time of the commission of each offense. This appeal is prosecuted from the judgment of conviction, it being urged: (1) that the evidence is insufficient to sustain a conviction upon either count, "inasmuch as there was no proof as to the intent with which the shots were fired . . . (or) of the intent with which the entry into the building was made"; (2) that the court erred in failing to instruct the jury on the subject of intent; (3) that the court erred in refusing to give a certain instruction requested by appellant.

The facts which form the basis of the instant prosecution may be summarized briefly as follows:

Around the hour of 1:30 o'clock in the morning of March 20, 1939, one Benjamin F. Sanford, who operated a grocery store in the city of Burbank, residing in a building at the rear thereof, was awakened by the buzzer of his electric burglar alarm at the head of his bed. He shut off the alarm and

looking through a window in his apartment saw two men trying to open one of the windows in the rear of the store building. A light was shining in the yard between the two buildings, the distance between them being approximately twenty feet. He waited until the men had opened the window with a bar and one of them had crawled into the store, when he called the police department of the city of Burbank and reported a burglary. He then obtained a shotgun from a closet and stationed himself at the door of his apartment facing the rear of the store. Shortly thereafter officer Loyd arrived in response to the call, and walking up to one of the intruders who was standing outside a window at the rear of the store, he ordered him to put up his hands or he would kill him. At that moment a shot was fired at said officer Loyd, either by the man standing outside the window or by the man who was inside the store. The man on the outside, who was later identified as John Lorton, surrendered to the officer who disarmed and handcuffed him. In the meantime, the man who had been inside the store came to the door holding a revolver in his hand and was told by Mr. Sanford to stick up his hands. He thereupon went back inside the store followed by officer Loyd, who was immediately fired upon, the shot creasing his arm. Officer Loyd jumped behind a pillar and two more shots were fired, the officer returning the fire. One of the shots allegedly fired by the assailant glanced off a wooden butter case, four or five feet from the ground, near the place where officer Loyd was standing; another shot struck the pillar behind which said officer had taken refuge, at a point three feet and ten inches from the ground; a third shot struck a gum rack and pierced the wall above the place where officer Loyd was standing.

At the trial officer Loyd testified with respect to the gun fight in the store as follows:

" . . . at that time Mr. Sanford said there was another man in the building, and with that I went to this rear door which was partially open, swung it wide open, looked in, and it looked to be kind of a storeroom, flashed my light and there was no one there, and then I saw a switch on the wall, so I went over to the switch and put the light on, the switch on, and with that, instead of lighting up the whole building, it threw a light directly over me and just as the light came on there was a shot and I felt my arm apparently numb. . . .

I jumped behind a pillar, an upright pillar, about five feet from me, which is about ten inches square, and I waited for an instant, and I called to this man, whoever he was, to stand up. . . . I could not see anyone, no, but the rest of the store was in semi-darkness. I called to him twice but there wasn't any sound, or any reply, and not knowing where the man was, I took my cap off, kind of held it to one side, and when I did there was another shot. Well, that gave me the location of where this man was, and then I returned the fire, and after I had shot the one time there was another shot towards me; I did not know at the time where that shot had gone. I returned two more shots and then everything was quiet, so I kept waiting, thinking I would hear some person, and I saw the front door start to open; you could just see the light from the street and the only thing I could see, it looked just like over the top of a man's head or hat, as he slid out the front door, and that is when I called to officer Evans, when I saw this front door start to open, to look out, that he was coming out. Immediately after that there was a shot outside, so I went back then and took the man that Mr. Sanford was guarding.''

Appellant was arrested in Porterville and brought back to Burbank by Chief of Police Adams of the latter city, who testified that he had a conversation with appellant on the return trip, to-wit: ''I was talking to him about the burglary of the Sanford Market and the shooting of the officer—shooting at him, rather, and he said yes, that he did, but that he did not mean to hit the officer, that he shot at him to scare him so that he could get away. I asked him what kind of a gun he used. He said it was a 30–30 rifle with the barrel sawed off. . . . I said, 'Well, you know that we had Johnny' —speaking of Johnny Lorton—I said, 'You know we had him up and tried him on the charge and he testified that you made him go in there and shoot at the officer and burglarize this place or that you would kill him.' He says, 'I did not say that.' He says, 'Johnny and I went out there together. We broke in the store . . . I went in first and . . . Johnny held the gun,' meaning the 30–30, and also that Johnny had a revolver and that 'if Johnny wanted to get away or wanted to kill me, . . . he could have, because I am the one that went in the store.' So then when we got down home I booked him and locked him up . . . and then I called Johnny in the

office and Pineda (appellant) in the office, and I asked Pineda to tell me the same story he had told me yesterday, so he related the same story . . . in the presence of Lorton. First, Lorton said that it was not true, that Pineda was lying, so then he changed his mind and Pineda says, 'Well, why don't you tell the truth?' He (Lorton) changed his mind and said it was not true, that he had just lied to just get out of the other case." This witness also testified that on the day of the preliminary trial, Lorton took the witness stand and related the same conversation that he had told him.

Appellant took the stand in his own defense, denied firing the shots or entering the building, and attempted to place the blame on one Frank Lopez, whose whereabouts was not disclosed. Appellant admitted he told Chief of Police Adams that he had been a participant in the burglary and had shot at officer Loyd; that he made these admissions because he was trying to protect his friend, Frank Lopez.

John Lorton, the man who was caught at the scene of the crime and who was later tried and acquitted, testified on behalf of appellant. On direct examination he said it was not appellant who had been at the store with him on the night in question, but Frank Lopez. On cross-examination, he admitted perjury. He admitted that when he was tried for burglary he stated that appellant was the man who was with him at the store. He also admitted having testified at the preliminary hearing in appellant's case at which time he had definitely stated that appellant was the man in the store on the night of the burglary.

"In a prosecution for an assault with intent to commit murder, a specific intent to murder must be proved. Such intent is an essential ingredient. In this respect the offense differs from murder and from an assault with a deadly weapon, or other means likely to produce great bodily injury, in which no intent is necessary to be proved. . . . It is not necessary to prove a deliberate and premeditated intent to kill, but only an intent to kill under circumstances from which malice would be implied. . . .

"As a general rule, one is presumed to have intended the immediate and natural consequences of his act, but where the act becomes criminal only when performed with a particular intent, such intent must be alleged and proved as a fact. Whether the required intent existed is a question for the

jury, to be determined from all the circumstances, including the nature of the weapon, and the consequences likely to follow from the use thereof.'' (13 Cal. Jur. 752, 753, and authorities there cited.)

''Where a specific intent is a necessary element of an offense, the intent is a question of fact to be determined from all the circumstances of the case. And except in a case where the facts proven afford no reasonable ground for an inference as to intent, it is the peculiar province of the jury to find the intent, and to say what particular intent follows from the acts done.'' (8 Cal. Jur. 278, citing *People* v. *Espalian,* 92 Cal. App. 610 [268 Pac. 702].)

In the Espalian case, defendant was convicted of the crime of burglary and contended upon appeal that the *corpus delicti* was not established by the evidence. There the evidence showed the presence of defendant in a lodging house at the hour of 4:30 o'clock in the morning, and when ''discovered he was standing within two feet of the door of one of the rooms in the lodging house which door was then slowly closing. On being questioned, defendant stated that he was a roomer in the lodging house and that he was 'looking for a toilet'. He was not a roomer there; nor did it appear that he used the toilet after his discovery.'' He was armed with a knife and had in his possession a passkey known as a ''pick'', and it appeared in evidence that the lock on the door which was closing at the time defendant was first discovered in the lodging house was one which could have been readily unlocked with the key in defendant's possession.

In the cited case it was held at page 612: ''The final determination of whether the *corpus delicti* was proved depends upon the motive which actuated defendant in entering the lodging house. If, as defendant claimed, his only purpose was to visit a toilet, no crime would have been committed. On the other hand, if defendant entered the lodging house with the intention of committing either grand or petit larceny, he was guilty of the crime of burglary. (Sec. 459, Pen. Code.)

''From the circumstances of the case, it would appear that evidence tending to establish the *corpus delicti,* as well as evidence of the fact that defendant was the person, if any, who committed the crime of burglary, was so interwoven that evidence to the effect that the crime of burglary had been committed would also point to defendant's guilt.''

■ The circumstances present in the case under consideration point with greater force to the commission of the crime of burglary than did those of the Espalian case. Here Mr. Sanford watched appellant and Lorton together force an entrance into his grocery store at 1:30 o'clock in the morning, using a bar three feet in length. Both men were armed and it was conclusively shown that the moment officer Loyd appeared upon the scene in answer to Mr. Sanford's telephone call, one or the other of the intruders fired a shot at him.

Appellant's statement to the chief of police and upon which he relies as showing a complete lack of intent to kill officer Loyd, to-wit: that he did not mean to hit him; that he only shot to scare him so that he could make his escape, is so incompatible with the facts established by the evidence herein as to be ridiculous. Appellant was not content with one shot which struck officer Loyd and creased his arm, but he continued to fire his 30–30 sawed off rifle and barely missed hitting the officer with at least two other shots.

■ The evidence was amply sufficient to sustain the convictions upon both counts. ■ The question of intent with which appellant acted was one of fact for the determination of the jury to be deduced from all the facts and circumstances surrounding the entry of the building and the shooting of the officer.

■ A review of the instructions reveal that the court fully instructed the jury as to the law involved in the cause. However, appellant urges that the court erroneously refused to give the following instruction requested by him:

"If, after hearing all the evidence in this case, you believe that the defendant is guilty, either of an assault or of an assault with a deadly weapon, but there is in your minds a reasonable doubt as to whether or not at the time of making such assault he did so with the intent to commit murder you must give him the benefit of such doubt and must not find him guilty of an assault with intent to commit murder as charged in the information though you may find him guilty of an assault or of an assault with a deadly weapon."

The jury was fully and correctly instructed as to how to draw inferences from facts proved, and an instruction was given correctly defining assault with a deadly weapon, as well as defining deadly weapon. An instruction was also given on the question of injury in an assault and violent injury, followed by an instruction with respect to assault with a deadly

weapon with intent to kill and murder. In a previous instruction the court had directed the jury with regard to the presumption of innocence and gave complete instructions on the subject of reasonable doubt. There was no error on the part of the trial court in its refusal to give an additional instruction on the subject of reasonable doubt.

On the burglary charge, the court's instructions contained the direction that "The essence of the offense of burglary consists in the intent with which such entry is made." This was followed by an instruction with respect to evidence susceptible of different constructions, in which the jury was cautioned that where two constructions were possible and both were reasonable, it was bound to adopt the interpretation which would admit of appellant's innocence and reject that which pointed to his guilt.

Since the jury received instructions on the subject of specific intent, the cases cited by appellant, including *People* v. *Snyder,* 36 Cal. App. (2d) 528 [97 Pac. (2d) 976, and *People* v. *Warren,* 16 Cal. (2d) 103 [104 Pac. (2d) 1024], in support of his third and fourth contentions are not in point.

The evidence was legally sufficient to support the judgment of conviction and no prejudicial error appears in the record.

The judgment is affirmed.

Doran, J., and White, J., concurred.