GENE MURPHY v. STATE.
No. A-10263.   July 26, 1944.
(151 P. 2d 69.)

32

A. G. Windham and Clyde Followell, both of Poteau, for plaintiff in error.

Randell S. Cobb, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Foster Windham, Co. Atty., LeFlore County, and James Babb, both of Poteau, for defendant in error.

BAREFOOT, J. Defendant, Gene Murphy, was charged in the district court of LeFlore county jointly with Bill Richardson and others, with the crime of assault with intent to kill, demanded a severance, was tried and convicted of the included crime of assault with a dangerous weapon, and his punishment assessed by the jury at four years in the state penitentiary. From this judgment and sentence he has appealed.

To properly consider the errors assigned, it is best to give a short statement of the facts, as revealed by the record.

The defendant was charged with the crime of assault with intent to kill, under 21 O. S. A. 1941 § 652, which is as follows:

"Every person who intentionally and wrongfully shoots, shoots at, or attempts to shoot at another, with any kind of firearm, airgun or other means whatever, with intent to kill any person, or who commits any assault and battery upon another by means of any deadly weapon, or by such other means or force as is likely to produce

death or in resisting the execution of any legal process is punishable by imprisonment in the penitentiary not exceeding ten years."

Under the instructions of the court, he was convicted of assault with a dangerous weapon as an included offense, under 21 O. S. A. 1941 § 645, which is as follows:

"Every person who, with intent to do bodily harm, and without justifiable or excusable cause commits any assault upon the person of another with any sharp or dangerous weapon, or who, without such cause, shoots or attempts to shoot at another, with any kind of firearm or air gun or other means whatever, with intent to injure any person, although without intent to kill such person or to commit any felony, is punishable by imprisonment in the penitentiary not exceeding five years, or by imprisonment in a county jail not exceeding one year."

Defendant and one of his codefendants, Bill Richardson, were constables in adjoining townships in LeFlore county. Allen Clack and Margaret Clack were husband and wife, but had separated and a divorce suit was pending. On the evening of August 21, 1941, Margaret Clack and her sister Jessie Humes, and a cousin, Ben Hardaway, who lived in California and was visiting at the home of Mr. and Mrs. Alex Avery, the parents of Mrs. Clack and Mrs. Humes in LeFlore county, left the Avery home about 8 o'clock, in an automobile belonging to Ben Hardaway, and bearing a California license tag. They were presumably driving around to the different towns and cold drink stands in the vicinity. About 10 o'clock they drove to a place known as the "Three-Way" filling station and beer tavern, about two miles west of the town of Spiro, but they did not get out of the car. While they were there, Allen Clack, the husband of Margaret, approached Gold Fry, the proprietor of the "Three-Way", and told him that his (Clack's) wife was outside waiting for Fry. They

had some conversation and Clack wanted Fry to go outside and fight. Fry testified that he did not know Mrs. Clack was out there, and did not go out. Hardaway, Margaret Clack and Jessie Humes left the "Three-Way" and drove around for some time, but returned soon after 12 o'clock and just as they were closing. Mr. Fry got in the car with them, getting in on the driver's side, and driving, Mrs. Humes sitting to his right and Mr. Hardaway to her right, all in the front seat, and Mrs. Clack in the rear seat. They started to Poteau to get something to eat, decided it was too late, and drove to Spiro. They discovered that Allen Clack was following them in his car. They drove around for some time, and stopped at a filling station and talked with the night marshal, E. V. Sharp. Allen Clack stopped his car just across the street from the filling station. They left the filling station, and drove out of town, going west. Mr. Fry and Mrs. Humes testified that the Allen Clack car followed them, and that they observed another car with dim lights come out of a side street and fall in behind the Clack car, and both cars continued to follow them. They drove on for a quarter of a mile, and saw the car which had come from the side street drive up by the side of the Allen Clack car, drive alongside of it a short distance, then pull out in front of it to near the back of their car. The car then dropped back, and without warning the occupants fired three or four shots into the rear of the Hardaway car. They drove on to the Three Way station, circled it and went back to Spiro, and several more shots were fired, some of them passing through the back window, and two of them hitting the metal strip in the center of the front windshield. The occupants of the car ducked, and fortunately no one was injured. They returned to the filling station where they had talked with the night marshal, and the occupants of

the car from where the shooting had come also drove up. It contained the defendant and Bill Richardson, constables, and two women who were riding with them. The car driven by Allen Clack, one driven by his brother Arnold Clack, and another car in which Mr. and Mrs. Cloe Clark were riding, also immediately drove up to the filling station.

At the trial of the case Mrs. Humes and Gold Fry testified for the state. Mr. Hardaway had returned to his home in California, and Mrs. Margaret Clack was in Corpus Christi, Tex., she having secured a divorce, and neither of these parties testified.

Gold Fry and Mrs. Margaret Clack were arrested by the defendant and Mr. Richardson, and taken to the jail in Poteau. They were turned over to the night jailer. A deputy sheriff was called, and after talking with them, he permitted them to go to their homes, with the understanding they would return the next morning. There was some conflict as to just what was said by the defendant and Mr. Richardson with reference to filing charges. The night jailer and others testified that Mr. Richardson said, "He is a married man and she is a married woman.... Hold them for investigation." The constables testified that they ordered them held for drunkenness, and intended filing charges against them the next morning. No charges of any kind were ever filed against either of them.

The defense offered was that on the evening of August 21, 1941, a burglary had been committed in the town of Panama, in LeFlore county. That these officers, working together, had arrested a young boy who admitted committing the burglary, but told them that an older man was with him and had sent him into the house. Later the officers contacted a woman who conducted a cold drink

stand and who informed them that a party answering the description given them by the boy had been picked up by a car bearing a California or Texas license in front of her place of business. They testified that they were looking for this car, and when the Hardaway car with the California license passed, they followed it. They both testified that they drove up by the side of the car, threw their flashlight on the car, informed the occupants that they were officers, and that Constable Murphy got out of the car in front of the Hardaway car and the driver started up and came near running over him. They followed the car, and Mr. Murphy shot at the tires four times, only for the purpose of apprehending the parties in the car. They testified that they did not know who was in the automobile at the time of the shooting and were very much surprised and so expressed themselves that Gold Fry, whom they knew, was there. They testified that only four shots were fired.

Neither Allen Clack, his brother Arnold Clack, Mr. or Mrs. Clark, who were all present, testified in this case.

E. V. Sharp testified for the state. He was the night marshal at Spiro. He was acquainted with all the parties, and had seen Mrs. Margaret Clack, Mrs. Humes and Mr. Hardaway at least four times that evening while they were driving around. He had also seen the constables between 6 and 7 o'clock when they were driving with Mr. Bice, the deputy sheriff, looking for the party who had burglarized the house in Panama. He testified that he was standing at a filling station in the town of Spiro when the Hardaman car drove up, with Gold Fry driving. About the same time he saw Allen Clack drive up and stop just across the street. The occupants of the Hardaway car had discovered that Allen Clack was following them, and they asked him to take Mrs. Humes and Mrs. Clack home, but he refused to do so. They then drove west out

of Spiro, and Allen Clack in his car followed. A few minutes thereafter he heard the shooting and saw the cars coming from the west. One of the bullets hit the paved street in front of where he was standing. He heard four or five shots. Mr. Fry, driving the Hardaway car, pulled into the station, the constables followed, and Allen Clack, Arnold Clack, and Mr. and Mrs. Clark followed immediately. He saw constable Murphy put his gun in his holster as he got out of the car. He saw the officers single out Gold Fry and Margaret Clack and take them to jail. They did not take Hardaway and Mrs. Humes. This witness had talked with them immediately prior to the shooting, and they had no appearance of drinking and were not drunk.

Both Gold Fry and Mrs. Humes denied that defendant got out of his car and flashed his light on them and told them they were officers. They both testified that the back glass of the car was in perfect condition until shot out on the morning of August 22, 1941, and that the glass shattered all over the car and into the hair of the two women in the car.

Pictures of the automobile were introduced in evidence, and are attached to the case-made. The rear glass was entirely out, and the windshield shattered. The places where at least four of the shots hit the car are clearly discernible in the pictures. Another hit and glazed the top of the car.

It is contended by defendant that from the testimony as above set out, it does not show an "intent to injure any person although without intent to kill such person," on the part of the defendant, and for this reason is insufficient under the statute to sustain a conviction. Where intent is necessary in the commission of a crime, it has

been held that it may be proven by circumstances and by the action of the party at the time. The question of intent is a question for the jury. It may be inferred by them from what accused does and says and from all the facts and circumstances involved in the transaction. Snider v. State, 71 Okla. Cr. 98, 108 P. 2d 552; Underhill on Criminal Evidence (4th Ed.) 683; People v. Pineda, 41 Cal. App. 2d 100, 106 P. 2d 25.

One will be held accountable for the logical and ordinary consequences resulting from his acts. Wilson v. State, 50 Okla. Cr. 310, 297 P. 826; State v. Myers, 154 Kan. 648, 121 P. 2d 286. As to the acts of the defendant, the evidence is very conflicting. Under the state's evidence. the officers acted in a highly unlawful manner, and even under their own evidence were not justified in shooting as they did. In the case of Sharp v. United States, 6 Okla. Cr. 350, 118 P. 675, 676, this court in an early decision used this language:

"The defendant doubtless acted under the erroneous belief that as a peace officer he had a lawful right to shoot and kill the deceased when he failed to obey his command to halt. It is a common belief that erroneously prevails among petty peace officers that, if an offender runs from an officer attempting his arrest for a misdemeanor and does not stop on being commanded to halt, the officer may lawfully shoot him. Officers should know and understand that they have no authority to resort to the use of firearms or dangerous weapons in making arrests for offenses other than felonies, unless the offender resists the arresting officer. In that event all force necessary to overcome his resistance may be employed. Peace officers should always use great caution and prudence in the performance of their duties, and should never forget that it is only extreme necessity that will justify the taking of human life."

In the instant case the evidence reveals that the occupants of the Hardaway car had not in any way violated the law, not even by the commission of a misdemeanor. The overwhelming evidence was that they were not intoxicated, nor under the influence of intoxicating liquor just prior to and at the time of the shooting and their arrest. It is not contended they were in any way violating the traffic law. While it may not be good morals or manners for a married man to be driving in the same car with a married woman late at night, there is no law that prohibits such action. The officers did not have a warrant for the arrest of any of the occupants of the car, or for any one else. While officers are to be commended for their zealous enforcement of the criminal laws, yet they should at all times act as careful and prudent officers, and the rights of the citizens of the community, as guaranteed by the Constitution and the statutes of this state, should be respected.

There is evidence in the record that Allen Clack had offered a reward of $50 to anyone catching his wife, Margaret Clack, with a man. It is revealed that Bill Richardson knew of this offer, but he testified that he had not been hired. Defendant testified that he did not have this information. The action of the officer Richardson in singling out and arresting Margaret Clack and Gold Fry, and placing them in jail and turning the other parties loose might have justified the jury in coming to the conclusion that this was the reason for their arrest.

The evidence in this case is highly conflicting. It was heard by a jury in the home county of the defendant. They decided against the defendant. This court will not set aside the verdict of the jury when there is conflict in the evidence, and there is sufficient evidence on the part of the state to sustain it. It is only when the evi-

dence is insufficient to sustain the judgment and sentence that this court will set the same aside.

Defendant contends that the court erred in giving instruction No. 5, which was as follows:

"Now, in this case, if you find and believe from the evidence, beyond a reasonable doubt, that the defendant Gene Murphy, either by himself or in connection with anyone else, unlawfully, wrongfully, unlawfully and feloniously, made an assault upon Gold Fry, Ben Hardaway, Margaret Clack and Jessie Humes, or either of them, with a certain deadly weapon, to-wit: a pistol, and did then and there with said pistol shoot at and attempt to shoot such person, or either of them, although without intent to kill such person, but with intent to injure such person, or to commit any felony, as charged in the information herein, then and in that event you will find the defendant guilty of the crime of assault with a dangerous weapon."

This instruction is practically in the words of the statute. The contention of defendant is to place a technical construction on the statute. When this instruction is read in connection with instruction No. 4, which sets out the statute of assault with a dangerous weapon in full, there can be no question as to the correctness of instruction No. 5. The defendant could not have been denied any right to which he was entitled under this instruction.

We have carefully examined instructions Nos. 7 and 8. We find no error in the giving of these instructions. They were as favorable to the defendant as to the state, and especially instruction No. 8. It is unnecessary to quote them. They did not deprive the defendant of any substantial right, and were upon the defendant's theory of the shooting.

It is contended that the court erred in refusing to give three requested instructions. The first of these was

not justified under the evidence, and was not an issue in the case. Requested instructions Nos. 3 and 4 were covered by the general instructions given by the court.

The contention of the defendant that the court erred in failing to submit to the jury the offense of assault and battery as defined by 21 O. S. A. 1941 § 641, as an included offense, cannot be sustained. It is true that it is the duty of the court to submit to the jury every degree of assault But there is nothing in the evidence here that indicates an which the evidence in any reasonable view of it suggests. assault and battery. The weapon here used was a deadly weapon per se. No requested instruction was submitted by defendant covering this question. Whittle v. State, 53 Okla. Cr. 242, 9 P. 2d 960; Watkins v. State, 25 Okla. Cr. 10, 218 P. 895; Crain v. State, 24 Okla. Cr. 343, 217 P. 888; Wheeler v. State, 66 Okla. Cr. 127, 90 P. 2d 49.

This case brings into view a wild night in LeFlore county. We have not discussed all of the evidence as revealed by the record, as it was unnecessary. It reveals that officers in their zeal sometimes overrun the law. It is regrettable that they should pay the penalty, but the law is so written that he who violates it shall suffer the consequences. This defendant had been an officer for a number of years. His experience and opportunity to know the law was no doubt a strong factor, taken into consideration by the jury, in his home county, in finding him guilty, and assessing the punishment they did.

Finding no error, the judgment of the district court of LeFlore county is affirmed.

JONES, P. J., and DOYLE, J., concur.