[Crim. No. 3093. Third Dist. July 20, 1960.]

THE PEOPLE, Respondent, v. ALBERT JAMES NIELSON, Appellant.

Rawles, Nelson & Golden for Appellant.

Stanley Mosk, Attorney General, Doris H. Maier and Edsel W. Haws, Deputy Attorneys General, for Respondent.

VAN DYKE, P. J.—This is an appeal from a judgment of the Mendocino County Superior Court based upon a jury verdict finding appellant guilty of murder of the second degree, and from the order denying motion for new trial.

On November 30, 1959, appellant was residing in a trailer. The deceased, Lew Foster, accompanied by one Sally Brown, visited the trailer of a Mr. Richardson, which was located about 40 feet distant from that of appellant. Theretofore appellant and Sally Brown had lived together for several years without marrying, but recently she had left appellant and taken up with Foster who was separated from his wife and family. Foster, Sally and Richardson engaged in conversation and card playing. They drank several drinks of hard liquor. Appellant came to the Richardson trailer about 45 minutes after Foster and Sally had arrived. Upon entering the trailer he greeted the others amicably and the group talked and visited for a while, then appellant and Sally left the Richardson trailer, she having said something to him about taking her to his trailer. Appellant testified that she said she had a message from her children to give to him. Appellant told Foster they would return in a few minutes and the record does not show that Foster objected to her leaving with appellant. Upon arriving at appellant's trailer, Sally, who was intoxicated, went to sleep on the daybed. Appellant turned out the lights and began watching television. In about 30 minutes Foster left the Richardson trailer, remarking that he was "going to go over and try to get Sally to come home" with him. Richardson testified he said to Foster, "Look, you have been drinking. Just leave them alone and come back tomorrow and talk it out." Foster nevertheless went to appellant's trailer. His attitude as he left Richardson did not appear unfriendly or belligerent. He was, however, grossly intoxicated. A blood analysis taken after his death revealed an alcoholic blood con-

tent of .48, and the autopsy surgeon testified that he might well have died from such excess intoxication if he had received no wound. Richardson remained in his trailer listening to a radio broadcast until he heard somebody outside calling for help. He opened the door and found Foster lying on the ground. Police were called and Foster was found to have a wound on the left side of his abdomen just above the belt line. He was taken to the hospital, but died on the way. The autopsy report showed he had suffered a clean incised wound such as a knife would make and that the renal vein had been lacerated, causing about two quarts of blood to flow into the abdominal cavity. The autopsy surgeon testified that in his opinion death resulted from this loss of blood. Before the police arrived the trailer camp manager went to appellant's trailer and summoned him to the door. When he appeared he was holding a knife in his hand. When asked what he was doing with it he replied, ''That's my protection.'' He also said, ''I did it'' and ''I did it to protect my own personal property.'' To the arriving officers he stated he had acted in protection of his property. He accompanied them to his trailer and delivered a butcher knife which was on the table next to the trailer door. He made oral statements to the officers wherein he said that he had turned off the lights in the trailer to watch television when he heard a knocking on the door; that he first ignored the knocking but it became louder; that he started to open the door and as soon as he had it unlatched someone outside pulled it open and started into the trailer; that he knew who it was and so he took the knife and lunged. He said, ''I grabbed the door and opened it and it went and I grabbed it [the knife] and lunged.'' He stated that there were no words spoken, that the knocking was all he heard, that no one called his name, and that no words were said even after the door was open; that after the episode at the door he shut the door and went back to watching television. To another officer and at the place where the body of Foster lay he stated, in response to a question as to what he had used, that he had used a knife. He also said that he ignored the knocking on his door because he didn't want to be bothered, but that the knocking continued and got loud; that someone tried to open his trailer door and he got up and went to see who it was; that when he started to open the door the person outside pulled it out of his hand, but he couldn't see who it was; that this person stepped up to enter the trailer, whereupon he had grabbed the knife, went forward with it and,

as he put it, "stuck the man." He said the man said nothing to him, just looked kind of blank and turned around. To another officer he stated that when the man came he couldn't see who it was. The officer then stated to appellant, "Well, it could have been anybody you stabbed then?" and appellant replied, "It could have been because I couldn't see who it was." When the officers came into the trailer Sally woke up and talked to appellant. He told her he had gotten into a fight with a fellow and he was protecting himself. She asked, "Was it Lew?" and he said "I don't know." She asked again, "Was it Lew?" and he said "Yes" and immediately said, "I don't know."

Later he wrote out a statement for the officers and signed it. It was introduced in evidence. In substance it was as follows: Appellant, who was unemployed at the time, had driven to a neighboring town and had come home around 5 p. m. He went to his trailer and turned on television. About 6 p. m. Sally came over and fell asleep on the daybed in the front of the trailer. About 8 p. m., with all the lights out, he heard someone knocking on the door, which he didn't answer until it got louder and louder and someone began trying to pull the door open. He got up and unlocked the door to see who it was. As he unlocked it a man pulled the door open and started to step in. He grabbed one of the knives lying on a table next to the door and stuck it in the man's stomach. Neither said a word to the other. The man looked at him with a blank stare, turned and walked away. Appellant closed the door and sat down. When the trailer camp manager knocked on his door, he answered the door, this time with a knife in his hand. He was told that he was wanted across the driveway, and when he arrived there the police were there and the man he had stabbed was lying in front of Richardson's trailer.

Appellant assigns error in the court's refusal to give certain instructions and in the giving of certain instructions on confessions and admissions and also argues that the court should have, at the close of the state's case, directed an acquittal. Appellant further contends that the evidence was insufficient to support a conviction of murder of the second degree and that the court should have limited the issue to manslaughter. Further, appellant contends that the court unduly limited his *voir dire* examination of the jury panel and was guilty of misconduct during the examination of the jury panel and was guilty of misconduct during the trial.

The court instructed the jury that the evidence was

insufficient to show murder of the first degree for lack of proof of necessary deliberation or premeditation. The court then instructed the jury as to the elements of murder of the second degree, stating that such a murder was an unlawful act characterized by the presence of malice aforethought, by the specific intent to kill, and by the absence of premeditation and deliberation. There is sufficient evidence to support the verdict of murder of the second degree. Although there is no testimony of any quarrel between the two men arising out of their relations with Sally, nevertheless the jury could infer that there was antagonism between them. Although appellant said at one time that he did not know who it was he stabbed he made other statements to the effect that he did know it was Foster who was seeking to gain entrance to the trailer. The jury could infer that, knowing it was Foster, he seized the knife before opening the door with the intent to use it on Foster if Foster attempted to enter the trailer and that he carried out this intent. From the suddenness of the attack on Foster and the fact that force was used sufficient to penetrate Foster's clothing and deep into his abdominal cavity and from the absence of any threat of harm to himself from Foster the jury could infer an intent to kill. Appellant must have known he had plunged the knife into Foster's body or, as he himself put it, "stuck him in the stomach," that Foster turned away bearing a serious wound, yet appellant closed his door and went calmly back to watching television, indicating a callous disregard for the consequences of his act. It is true that appellant testified Foster and he had had a previous altercation in which Foster had beaten him and departed, threatening to come back and "finish the job" later. From his testimony it appears that this altercation arose over Foster's attentions to Sally. Appellant contended that he acted in self-defense, but the jury were not compelled to accept this explanation, and it is apparent that they refused to do so. The evidence was sufficient to sustain the jury's verdict of murder of the second degree.

█ Appellant contends the court erred in refusing to give at his request the following instruction:

"In considering whether the circumstances surrounding the killing of the decedent were such as to excite the fears of a reasonable man placed in a similar position, you are entitled to take into consideration the following evidence in this case:

"1. That, approximately two weeks before the episode in-

volved in this case, the decedent had made a physical attack upon the defendant.

"2. That, approximately one week before the episode involved in this case, the defendant had suffered a heart attack and, at the time of the episode involved in this case, the defendant was concerned about the effect upon his physical condition of a physical encounter with the decedent.

"3. That the defendant is, to some extent, disabled by an acute arthritic condition.

"4. That the decedent was apparently a robust, energetic, younger, and heavier man than the defendant, who is a slightly built person in poor health.

"5. That the decedent was apparently intoxicated."

Appellant argues that since evidence as to matters contained in the instruction had been introduced it was error to refuse his request. But the court gave standard instructions on self-defense, including instructions on justifiable homicide by a householder in defense of his habitation and these instructions informed the jury that the person claiming self-defense or justification must act as a reasonable man placed in the same circumstances or a like situation as the appellant. Under these instructions the jury could consider the very circumstances which the requested instruction emphasized. We think the jury must have understood that if they accepted as true the testimony as to the prior attack and the state of health of defendant, the disparity in the size of the two men and the decedent's intoxication they could consider all of these matters in determining whether or not the appellant acted in self-defense or the homicide was justified. Any needed emphasis could be, and in fact was, supplied by counsel's argument to the jury and it is not to be supposed from the record that the giving of the additional and detailed instruction requested was necessary. We find no error in the refusal to give the requested instruction.

▮ Appellant's contention that the court should have ordered an acquittal at the close of the prosecution's case is without merit. His argument is that the corpus delicti had not been established independently of extrajudicial statements of the appellant and that, assuming that the corpus delicti had been so established, still the People's proof showed that the killing was justified. The death of Foster had been shown and the other element necessary to prove the corpus delicti, that is, that the death had been caused by some criminal agency was sufficiently shown by the nature of the wound as described

by the autopsy surgeon and the result thereof. The wound was sufficiently shown to have been made by a knife and Richardson had described the meeting in his trailer between Foster, Sally and appellant, the departure together of appellant and Sally, the statement of Foster that he was going to appellant's trailer in an endeavor to get Sally to come home with him, and the prompt return of the wounded man and his collapse just outside the door of Richardson's trailer. The foregoing was sufficient proof of corpus delicti and justified the introduction of the statements of appellant.

Appellant's contention that as a matter of law the People's proof showed the killing was justified is untenable. We think it unnecessary to discuss this assignment at length since it is apparent from the record and the portions thereof already stated that it was for the jury to determine whether or not appellant acted with justification.

Appellant contends that the trial court unduly limited his counsel's *voir dire* examination of the jury panel. It appears that when the jury box had been first filled and the remaining members of the panel were in the court room, the trial judge questioned those in the box concerning their knowledge of the case. Several said they had heard about the homicide or had read about it, but all stated they had formed no opinion on the issue of guilt or innocence. When the court had concluded its questions, counsel for the appellant began examining a juror who does not appear to have made any specific response and of this juror counsel asked if he had heard anything about the facts of the case or had read anything about it. The court informed counsel that the matter had been covered and counsel requested opportunity to ask the question individually of each of the members of the panel in the box. This was refused. Counsel thereafter, as appellant now argues, refrained from asking any other prospective juror whether he or she had heard anything about the case, even though after a number had been excused on peremptory challenges, others had been called to the box from the body of the panel. The *voir dire* proceedings are a part of the reporter's transcript and our examination thereof convinces us that there was no unfairness toward appellant in the selection of the jury. Counsel for the appellant examined the individual jurors rather extensively and announced himself as satisfied with the jury at a time when he possessed many peremptory challenges which he had not used. It is true that the question about knowledge of the case was not repeated to the several jurors

called to take the place of those challenged, which altogether numbered three, but in the colloquy between court and counsel the court stated that all of the members of the panel had been sworn to answer questions touching their qualifications and that three or four of those in the box at the time had asserted they had heard something about it. The court then asked if anybody else had heard anything about the case and received no response. While it would have been better as new jurors were placed in the box to have questioned them concerning their knowledge, we cannot say from this record that the jury was unfairly selected.

Turning now to the charges of misconduct, appellant asserts that the trial judge misconducted himself in that whenever he addressed remarks to appellant's counsel he did so in a gruff, curt, harsh and irritating tone of voice and used facial expressions of irritation and annoyance. Of course these matters do not appear in the record since there were no objections made during the trial to the alleged misconduct of the judge. It was only on the motion for a new trial that these contentions were presented. The proper time to present such matters is during the trial and counsel is not permitted to wait until the result of the trial is ascertained before acquainting the court with his belief that he is being unfairly treated. (*People* v. *Cox,* 174 Cal.App.2d 30, 41 [344 P.2d 399].)

The court gave instructions defining the terms "confession" and "admission," stating concerning confessions that the term meant declarations of participation in the crime for which the defendant is on trial of such nature that no other inference than the guilt of defendant may be drawn therefrom. The court continued as follows: "The law absolutely forbids you to consider a confession in determining the innocence or guilt of a defendant unless the confession was voluntarily made, and although the court has admitted evidence tending to show that defendant made a confession, you must disregard the asserted confession entirely unless you, yourselves, by your own weighing of all the evidence, your own judgment of the credibility of witnesses, and your own reasonable deductions conclude that the alleged confession not only was made, but was voluntary." It is clear from the record that no statement of the appellant in the nature of a confession was proved, although the appellant, as hereinbefore related, made various conflicting statements, some of which constituted admissions; none nor all of the statements could

be construed as measuring up to a confession. Under such circumstances it was error to instruct on confessions, and the court misinformed the jury when it told them that it admitted evidence tending to show that the defendant had made a confession. In discussing confessions and admissions the court further told the jury that though a confession must be shown to have been voluntary that rule would not apply to admissions. This, too, was error, since there is no distinction in law in this respect between admissions and confessions. (*People* v. *Atchley*, 53 Cal.2d 160, 169 [346 P.2d 764].) However, the principal error lay in the statement by the court that it had received evidence tending to show a confession when the fact was otherwise, for this was a characterization of evidence which the jury might well have considered was the court's estimate of the legal effect of statements made by the appellant. There was actually no claim by the prosecution that the appellant had confessed and an examination of the record shows that no such position was taken in argument. Argument was, of course, addressed to the admissions made, as was proper, but nothing was said in the way of a claim that the appellant had ever confessed the crime with which he was charged. In weighing the effect of the error we are discussing, we must bear in mind that the jury were instructed after the arguments were in and that the court's instructions were the last words spoken to the jurors before they began their deliberations. The court's statement that evidence had been received tending to show a confession, coupled with the court's definition of that term, and the further instruction concerning how the jury should determine whether a confession had been made, and if so, whether it had been voluntary, compel a reversal. We think from a consideration of the whole record that it is probable a result more favorable to appellant would have been reached by the jury had the instruction about confessions not been given.

The judgment and the order are reversed.

Schottky, J., and Warne, J. pro tem.,* concurred.

A petition for a rehearing was denied August 12, 1960, and respondent's petition for a hearing by the Supreme Court was denied September 14, 1960.

---

*Assigned by Chairman of Judicial Council.