[Crim. No. 3104. Third Dist. Oct. 10, 1960.]

THE PEOPLE, Respondent, v. C. W. WADE, Appellant.

John E. Barbeau, under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, Doris H. Maier and Nat Agliano, Deputy Attorneys General, for Respondent.

WARNE, J. pro tem.*—Appellant was accused by an information of a violation of section 10851 of the Vehicle Code (car theft) in Count I and of a violation of section 211 of the Penal Code in Count II (robbery). A jury found appellant guilty of robbery of the first degree. He was acquitted of the charge of car theft. He has appealed from the judgment and the order denying him a new trial.

The record discloses that appellant spent the greater part of November 27, 1959, and the early hours of the following day, alternately in the Sierra Club, the Travelers Hotel bar

*Assigned by Chairman of Judicial Council.

and back in the Sierra Club, in the city of Auburn, where his activities consisted of a combination of drinking, gambling, fighting and dancing. At approximately 2:15 a.m. on the morning of November 28th, appellant and one Richard Ottmann, an accomplice, left the Sierra Club, and drove to the residence of Ottmann in the latter's automobile. Upon arriving at Ottmann's home, appellant remained seated in the automobile. Ottmann entered his house and shortly thereafter returned to the car with two pairs of heavy workman's gloves, a jacket, two hats, a box of shotgun shells and a shotgun. Appellant stated that their purpose was, "I guess he—we was [sic] planning to rob a place or something." After appellant and Ottmann discussed robbing a service station, they drove to the vicinity of the Sierra College in Auburn, where Ottmann stole a light green 1956 Ford automobile with white sidewall tires. The shotgun and other paraphernalia acquired by Ottmann were transferred to the stolen car. Appellant put on the jacket, gloves and hat and the two men drove off, leaving Ottmann's car behind. Ottmann sat in the back seat with the shotgun for greater maneuverability of the weapon. The first stop was at a Standard service station on United States Highway 40 near Lou LaBonte's restaurant. Appellant pulled into the service station and told Ottmann, "get the attendant." Ottmann replied, "Go on out of here," and they left before the attendant arrived. When they were back on the highway, appellant asked Ottmann whether he was "chicken." Thereupon appellant turned the automobile around and again drove to the same service station. Ottmann, however, once more refused to act and when the attendant arrived he was merely asked to check the oil. They drove to the Hilltop Standard station in Auburn, where the robbery was committed. The station attendant testified that one of the occupants of the car sat in the back seat, wore a white bandana over his face, and pointed a gun at him through the window. He ordered the attendant to empty the cash box in a hurry. The attendant took the entire tray containing approximately $44 in cash and handed it to Ottmann through the rear window of the automobile. After the robbery appellant drove toward Ophir, where they left the highway and stopped on a dirt road where the money was divided. They drove to Loomis and thence to Roseville where appellant and Ottmann were arrested and taken to the Roseville Police Station. The loaded shotgun, the box of shotgun shells, the gloves and hat were all found in the car.

During the booking procedure in the Roseville Police Station, appellant admitted driving the car used in the robbery but denied having anything to do with the gun or the actual taking of the money. At the same time it was noted that he wore a white handkerchief around his neck and was wearing a heavy jacket. The booking officer testified that appellant said, "he'd been drinking quite a bit, couldn't remember quite a bit of it, didn't know why they did it. . . ." He further testified that appellant said part of the money he had in his coat pocket belonged to the service station. Appellant later that morning, after having been removed to the Auburn Police Station, requested to see Police Chief Young. This was arranged. Police Chief Young testified that immediately upon his arrival appellant said, "You've got to get me out of here. What's my bail, . . .," to which he replied, "I have nothing to do with establishing bail. That will be done by the Court." Appellant then stated, "Why did I get mixed up in this anyway for nine lousy bucks? That's all I got out of it. I don't need nine bucks. I don't [need] money. . . . You have some pull around here. . . . If you would just open that door, you would never see me again. I'd take off. I'll leave the country." On November 30, 1959, a recorded conversation was had between appellant and A. E. McFarlane, investigator for the district attorney's office. During that conversation appellant stated that upon leaving the Sierra Club and arriving at Ottmann's home, "He [Ottmann] went up and got the shotgun and coat and gloves. Then he put those in the car. Then he went back up and got me a coat and pair of gloves." He was asked, "Why did he get the coat and gloves?" and answered, "Like I—I guess he—we were planning to rob a place or something." He further stated that he had worn the leather jacket and gloves supplied by Ottmann and that he had a white handkerchief "knotted up in front of my face." Investigator McFarlane also testified that in an earlier interview appellant said, "he believed they were going to rob somebody. I asked him why they used the jackets, hats and gloves, and he said he believed it was for the purpose of disguising their identification so no one would recognize them."

Several witnesses testified that appellant was in a very intoxicated condition throughout the evening and when he left the Sierra Club on the morning of the robbery. There was also testimony that at the age of 17 years appellant suffered a serious head injury which resulted in a marked change

in his personality; that his reputation for truth and honesty was good but when intoxicated his conduct was distinctly altered for the worse. Appellant, himself, testified that while he could remember leaving the Sierra Club, going to Ottmann's house, wearing the jacket, gloves and hat, the theft of the automobile by Ottmann, the driving into the first Standard station near LaBonte's restaurant, and their subsequently being stopped and arrested in Roseville, he nevertheless had no recollection of any participation in the robbery of the Hilltop service station.

A psychiatrist, a defense witness, testified that in his opinion appellant was not conscious of his actions at the time of the robbery. Dr. G. Dean Tipton, Medical Director and Superintendent of DeWitt State Hospital, a licensed medical doctor and psychiatrist, a witness for the prosecution, however expressed the opinion that appellant was aware of what was taking place on the night of the robbery. His opinion was based upon the facts told him by appellant and from his examination of him.

[■■] Appellant requested the following instructions which were refused by the trial court:

"You are also instructed that you must acquit the defendant if you have a reasonable doubt that he was actually conscious of the acts being committed."

"You are instructed that if you have a reasonable doubt as to defendant's intent then you must acquit him."

Appellant contends that since his main defense was a lack of consciousness of the act committed the refusal to give these particular instructions was prejudicial error. There is no merit in this contention. The record discloses that the trial court gave the following instructions on the subject matter:

"Section 26 of the Penal Code of the State of California states: Persons Capable of Committing Crime, Exceptions;

"All persons are capable of committing crimes except those belonging to the following classes:

"Subdivision 5. Persons who committed the act *charged* or ~~made~~ the ~~omission~~ without being conscious thereof." (Italicized word added in ink.)

"In the case of certain crimes it is necessary that in addition to the intended act which characterizes the offense, the act must be accompanied by a specific or particular intent without which such a crime may not be committed.

"Thus in the crime of robbery, a necessary element is the existence in the mind of the perpetrator of the specific intent

to steal *permanently deprived the owner of his property,* and unless such intent so exists, that crime is not committed.'' (Italicized words added in ink.)

''Whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act.''

''Thus the defendant may not be found guilty of the crime of . . . *robbery* . . . unless you can and do find from the evidence that he had the *specific* intent to ~~permanently~~ deprive the owner of his . . . *property.* This fact requires an inquiry into the state of mind under which the defendant committed the act charged, if he did commit it. In pursuing that inquiry, it is proper to consider whether he was intoxicated at the time of the alleged offense. The weight to be given the evidence on that question and the significance to attach to it, in relation to all the other evidence, are exclusively within your province.'' (Italicized words added in ink.)

''For the purpose of the issues now on trial, you must presume that the defendant was sane at the time of his alleged conduct, which, it is charged, constituted the crime described in the information.''

''You are reminded, however, that a person may be legally sane, as we define that term in dealing with the question of criminal responsibility, and yet be in an abnormal mental or nervous condition; and because of such condition, he might be less likely or unable to have or hold a specific intent or a certain state of mind, which as—is an essential ingredient of a certain crime. We have received evidence bearing on the mental and nervous condition of the defendant at the time of the alleged commission of the crimes charged. Such evidence may be considered by you in determining whether or not the defendant did (~~the~~) (any) overt act charged against him and, if so, whether or not at that time there existed in him the specific mental factor which, as you have been instructed, must accompany that act to constitute a certain crime or degree of crime. . . .''

The record also discloses that the trial court gave complete instructions on the subject of reasonable doubt. Thus, it appears that the jury was fully and fairly instructed upon the subject matter presented by defendant's proposed instructions. ''When the jury are fully and fairly in-

structed upon a subject it is not error for the trial court to refuse defendant's proposed instructions which are mere repetitions. The court is not required to state the law to the jury more than once, but may, as a general rule, refuse requested instructions which are fully covered by other instructions. A defendant in any given case is not entitled to have his own particular phrasing of the law adopted by the court or given to the jury. It is sufficient if the substance of the law applicable to his case is set forth by the court correctly in its instructions." (*People* v. *Parchen,* 37 Cal.App.2d 215, 223 [98 P.2d 1045]; see also *People* v. *Pineda,* 41 Cal.App.2d 100 [106 P.2d 25].)

Appellant also contends that there is insufficient evidence to corroborate the testimony of the accomplice, Ottmann. We find no merit in this contention. Appellant's own admissions, as hereinabove related, tending to connect him with the robbery, furnish sufficient corroboration. (*People* v. *Holt,* 88 Cal.App.2d 42, 44 [198 P.2d 58], citing cases.) Appellant had in his possession money stolen from the service station. Possession of stolen property alone has been held sufficient to corroborate an accomplice's testimony. (*People* v. *Wynkoop,* 165 Cal.App.2d 540 [331 P.2d 1040].)

Further the evidence, aside from the testimony of the accomplice, places appellant in the driver's seat of the automobile which was directly used in the robbery. This sufficiently corroborates the testimony of Ottmann, the accomplice.

As stated in *People* v. *Lyons,* 50 Cal.2d 245, 257 [324 P.2d 556] : "The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged. [Citing cases.]"

Appellant also contends that there is no evidence tending to constitute a confession and therefore the trial court committed prejudicial error by giving the jury an instruction on confession. The court gave instructions defining the terms "confession" and "admission." Concerning "confession" the court instructed: "The law absolutely forbids

you to consider a confession in determining the innocence or guilt of a defendant unless the confession was voluntarily made, and although the Court has admitted evidence tending to show that the defendant made a confession, you must disregard the asserted confession entirely unless you, yourselves, by your own weighing of all the evidence, your own judging of the credibility of the witnesses, and your own reasonable deductions, conclude that the alleged confession was not only made, but was voluntary." It is clear from the record that no statement of the appellant in the nature of a confession was proved, although the appellant, as hereinabove quoted, made various conflicting statements which constituted admissions. None or all of the statements could be construed as measuring up to a confession, hence, as this court stated in *People* v. *Nielson*, 183 Cal.App.2d 20, 29 [6 Cal.Rptr. 367], ". . . Under such circumstances it was error to instruct on confessions, and the court misinformed the jury when it told them that it admitted evidence tending to show that the defendant had made a confession." ". . . [A] confession by a defendant leaves nothing to be determined, in that it is a declaration of his intentional participation in a criminal act, and must be a statement of such nature that no other inference than the guilt of the defendant may be drawn therefrom." (*People* v. *Ferdinand*, 194 Cal. 555, 568-569 [229 P. 341]; see also *People* v. *Chan Chaun*, 41 Cal.App.2d 586, 593 [107 P.2d 455].) In the case of *People* v. *Nielson, supra*, in discussing "confessions" and "admissions," the court further told the jury that though a confession must be shown to have been voluntary that rule would not apply to admissions. This, too, was error, hence there is no distinction in law in this respect between admissions and confessions. (*People* v. *Atchley*, 53 Cal.2d 160, 170 [346 P.2d 764].) Further, as in the Nielson case, *supra*, at page 29, ". . . the principal error lay in the statement by the court that it had received evidence tending to show a confession when the fact was otherwise, for this was a characterization of evidence which the jury might well have considered was the court's estimate of the legal effect of statements made by the appellant. . . ." In the instant case, as in the Nielson case, "There was actually no claim by the prosecution that the appellant had confessed and an examination of the record shows that no such position was taken in argument. Argument was, of course, addressed to the admissions made, as was proper, but nothing was said in the way of a claim that the appellant had ever confessed the crime with

which he was charged. In weighing the effect of the error we are discussing, we must bear in mind that the jury were instructed after the arguments were in and that the court's instructions were the last words spoken to the jurors before they began their deliberations. The court's statement that evidence had been received tending to show a confession, coupled with the court's definition of that term, and the further instruction concerning how the jury should determine whether a confession had been made, and if so, whether it had been voluntary, compel a reversal. . . ."

The information charged in Count I a violation of section 10851 of the Vehicle Code (car theft), and in Count II a violation of section 211 of the Penal Code (robbery). Appellant contends that these offenses were not connected together in their commission and were not different offenses of the same class of crimes within the meaning of section 954 of the Penal Code and therefore the trial court erred in overruling his demurrer to the information on those grounds. We find no merit in this contention. The record discloses that the automobile was stolen for the purpose, and used in the commission, of the robbery. The shotgun and other articles used in the robbery were transported in the stolen automobile. An accusatory pleading may charge two or more different offenses connected together in their commission. (Pen. Code, § 954.) Further, as stated in *People* v. *Chessman*, 52 Cal.2d 467, 492 [341 P.2d 679], ". . . It appears that the situation here comes within the holding of cases which permit joinder of offenses, even though they do not relate to the same transaction and were committed at different times and places and against different victims, where there is a common element of substantial importance in their commission. . . ."

We do not deem it necessary to discuss other assignments of error claimed by the appellant.

The judgment and the order denying appellant's motion for a new trial are reversed.

Van Dyke, P. J., and Schottky, J., concurred.

A petition for a rehearing was denied November 4, 1960, and respondent's petition for a hearing by the Supreme Court was denied December 7, 1960.