[Crim. No. 4237. First Dist., Div. One. Sept. 20, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. HARVEY LEE SWAYZE, Defendant and Appellant.

478

Robert N. Sanford, Jr., under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Eric Collins, Deputy Attorneys General, for Plaintiff and Respondent.

MOLINARI, J.—On this appeal from a judgment after conviction by a jury for violation of section 11530 of the

Health and Safety Code (possession of marijuana), defendant raises a number of questions. In the discussion of each question we shall allude to the particular facts pertinent thereto. Preliminarily, however, we set out the following basic facts.

On January 16, 1962, one Clifford Chambers gave information to Officer Troy Stewart of the Concord Police Department that he just purchased some marijuana from a person by the name of Harvey Lee Swayze. Chambers gave a description of Swayze, the clothes he was wearing and the automobile he was driving. The description of the automobile was that it was a white Thunderbird, having the license number UDX 872 or UDX 782. The information also included a statement that a female would probably be observed riding with Swayze. This information was transmitted on the day it was received, through police channels, to Officer D. L. Bedsworth of the Concord Police Department, who, while patrolling an area in the City of Concord, shortly thereafter, observed a Thunderbird automobile fitting the aforementioned description in a service station. The said vehicle was occupied by two persons, a man and a woman. Bedsworth radioed for police assistance. Upon the arrival of Officer Christenson, the two passengers were asked to step out of the car. Thereafter, within an interval of one to five minutes, three other police officers (one of whom was Stewart) arrived on the scene. The automobile was thereupon searched by Officers Tamborski and Stewart. Tamborski found a plastic bag containing four brown paper bags under the seat. These bags contained a vegetable substance. The two occupants of the car were identified and ascertained to be defendant, Harvey Lee Swayze, and his sister. Defendant was placed under arrest and taken to the police station, where certain debris was removed from his shirt pocket. The aforementioned substance found in the paper bags was later chemically analyzed and found to consist of 292 grams of marijuana. A similar analysis of said debris likewise disclosed traces of marijuana.

The said search and arrest were both effected without a warrant. A motion by defendant to suppress evidence on the ground that it was illegally obtained was made prior to trial and the same was denied. Defendant was thereafter tried by a jury which returned a verdict finding defendant guilty of the crime of possessing marijuana.

### Was Chambers a Reliable Informant?

Defendant contends that Chambers was not a reliable

informant and that therefore the search and arrest could not be based on information secured from such informant. The rule asserted is well established and is stated as follows: In the absence of a pressing emergency, a search or arrest without a warrant may not be based on information secured from an informant not known to the arresting officers to be reliable. (*Willson* v. *Superior Court*, 46 Cal.2d 291, 294-295 [294 P.2d 36]; *People* v. *Dewson*, 150 Cal.App.2d 119, 127 [310 P.2d 162]; *People* v. *Bates*, 163 Cal.App.2d 847, 851 [330 P.2d 102]; *People* v. *Cedeno*, 218 Cal.App.2d 213, 220 [32 Cal.Rptr. 246].) ■ A valid search or arrest, however, may be made solely by reason of information conveyed by a single reliable informant. (*People* v. *Prewitt*, 52 Cal.2d 330, 337 [341 P.2d 1]; *Willson* v. *Superior Court, supra,* at pp. 294-295; *People* v. *Boyles*, 45 Cal.2d 652, 656 [290 P.2d 536]; *People* v. *Cedeno, supra,* at p. 219; *People* v. *Roland*, 183 Cal. App.2d 780, 784 [6 Cal.Rptr. 895]; *People* v. *Boyd*, 162 Cal. App.2d 332, 334 [327 P.2d 913].) ■ To justify reliance on the information received the informer must be known to the officer to be reliable, and must be a person whom the officer in good faith believes to be trustworthy. (*People* v. *Bates, supra,* p. 851; *People* v. *Williams*, 196 Cal.App.2d 845, 850 [16 Cal.Rptr. 842]; *People* v. *Cedeno, supra,* at p. 219.) ■ The rule of justification for search or arrest without a warrant is stated thusly in *Bates*: "In most cases the informant must not only be known to the officer, but the officer must have had sufficient dealings with the informant to give him reasonable cause to believe that the informant is reliable and that the information given by him is truthful. It is only in the case of a pressing emergency that an arrest or search without warrants may be justified based upon information secured from an anonymous informant, or from an informant not known to the officer to be reliable. [Citation.] ... ■ It is also well settled that in the absence of a pressing emergency, the officer may not properly arrest or search a person based upon information gained from an informant not known to the arresting officer, or, if known, not known from past experience to have been a source of tested reliable information." (P. 851.) The reliability of the informant may be shown not only by past experience with the informant, but also may be substantiated by the proven accuracy of the information given by the informant and which the officers from other sources know is accurate. This substantiation may be supplied by substantial corroborative facts known or dis-

covered. (*People* v. *Bates, supra,* p. 852; *Willson* v. *Superior Court, supra,* at p. 295; *People* v. *Holguin,* 145 Cal.App.2d 520, 523 [302 P.2d 635] ; *People* v. *Maddox,* 46 Cal.2d 301, 304 [294 P.2d 6] ; *People* v. *Diggs,* 161 Cal.App.2d 167, 171 [326 P.2d 194] ; *People* v. *Cedeno, supra,* at p. 220.) Accordingly, information which in the past has led the police to valid suspects has been regarded as tested reliable information. (*People* v. *Dewson, supra,* p. 128; *People* v. *Roland, supra,* at p. 784; *People* v. *Cedeno, supra,* at p. 220.)

██ ''A search without a warrant is proper where it is incident to a lawful arrest based on reasonable cause to believe that the accused has committed a felony. ██ Such a search is not rendered unlawful merely because it precedes rather than follows the arrest. [Citations.] ██ Reasonable or probable cause is shown if a man of ordinary care and prudence would be led to believe and conscientiously entertain an honest and strong suspicion that the accused is guilty.'' (*People* v. *Torres,* 56 Cal.2d 864, 866 [17 Cal.Rptr. 495, 366 P.2d 823].) As said in *People* v. *Ingle,* 53 Cal.2d 407 [2 Cal.Rptr. 14, 438 P.2d 577] : ''There is no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances [citations] — and on the total atmosphere of the case.'' (P. 412.) In making this determination, the applicable test is : Considering all the information in the hands of the police, would a reasonable police officer act on that information or would a reasonable police officer seek further information before making the arrest and conducting the search. (*People* v. *Diggs, supra,* at p. 171.) ██ When the legality of the arrest or of a search and seizure is properly and timely raised, the defendant makes a prima facie case by establishing that an arrest or search without a warrant has been made. The burden then rests upon the prosecution to show that the officers had reasonable cause for the arrest or search. (*People* v. *Haven,* 59 Cal.2d 713, 717 [31 Cal.Rptr. 47, 381 P.2d 927] ; *Tompkins* v. *Superior Court,* 59 Cal.2d 65, 67 [27 Cal.Rptr. 889, 378 P.2d 113] ; *Badillo* v. *Superior Court,* 46 Cal.2d 269, 272 [294 P.2d 23] ; *People* v. *Cedeno, supra,* pp. 220 - 221.)

██ The determination of the legality of the arrest or search is, however, a question involving the admissibility of evidence. Accordingly, it is a question of law for the trial court to be determined outside the presence of the jury. (*People* v. *Gorg,* 45 Cal.2d 776, 780-781 [291 P.2d 469] ; *People* v. *Lawrence,* 149 Cal.App.2d 435, 446-447 [308 P.2d 821] ;

*People* v. *Allen,* 142 Cal.App.2d 267, 281 [298 P.2d 714].)
 When the question of the reasonableness or legality of an arrest or search or seizure becomes an issue at the trial, the proper procedure by which to determine such question is by way of *voir dire* examination. (*People* v. *Gorg, supra,* at pp. 780-781; and see *People* v. *Berger,* 44 Cal.2d 459, 463-464 [282 P.2d 509].) When such determination is made by the trial court the only way it may be obviated is by a showing that there was no substantial evidence in support of it. (*People* v. *Allen, supra,* p. 281; *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Camargo,* 130 Cal.App.2d 543, 549 [279 P.2d 194].)

 In the case at bench the trial court followed the *voir dire* examination procedure outside the presence of the jury. This examination consisted of the testimony of Officer Stewart who testified that Chambers was known to him; that Chambers had given him information on previous occasions; that in the early part of 1960 he was told by Chambers that one Pedrico was taking narcotics intravenously; that Pedrico was subsequently arrested in March 1960 and later convicted of narcotic addiction; that Chambers had also given Stewart information that one Cecil Schaefer was taking narcotics intravenously; that Schaefer thereafter voluntarily surrendered himself to Stewart and turned over to him a quantity of narcotics and certain paraphernalia for the "shooting" of narcotics intravenously; that Chambers also had informed Stewart that one Kenneth Ferreira was contemplating the planting of a marijuana patch and showed Stewart some marijuana seeds which he stated he had gotten from Ferreira; and that Ferreira was later arrested for growing marijuana. Upon this evidence, the trial court admitted, over objection of defendant, the evidence relating to the arrest of defendant and the search of the automobile he was driving. The basis of the lower court's ruling was that, although the arrest and search were made without a warrant, the police officers had acted reasonably upon information obtained from a reliable informant. This ruling was proper. It is supported by substantial evidence and is in accord with the rules hereinabove discussed.

 Defendant argues that only Ferreira was arrested as a result of information furnished by Chambers,[1] and accord-

---

[1]Stewart testified that while Pedrico and Schaefer were both subsequently arrested, their arrests were not brought about by the information received from Chambers.

ingly asserts that information resulting in a single arrest is insufficient to establish the informer's reliability. We know of no case, nor has any been cited by defendant, which holds that a single arrest, based upon information supplied by a known informer, is insufficient per se to impress reliability upon the informant. The test of reliability is not the number of arrests or suspects to which the information has led, but the quality of the information imparted, that is, whether the information is of such substance as to cause a reasonable person to conclude that it is reliable. In the case at bench, Chambers' reliability was not restricted solely to information which had previously led to the arrest of Ferreira, but it likewise encompassed the information supplied as to Pedrico and Schaefer. While it is true that neither Pedrico nor Schaefer was arrested as a result of information given by Chambers, the information imparted with respect to them was such as to warrant the conclusion that it was accurate. Pedrico was later arrested and, as testified by Stewart, convicted for narcotic addiction.[2] As to Schaefer, his surrender to the police and his voluntary delivery of paraphernalia used to take narcotics intravenously were circumstances sufficient to warrant the inference that he was a narcotics user. We thus have a composite of information which combined to produce the tested reliable information which justified a reasonable police officer in believing that Chambers' information relative to defendant was trustworthy.

Defendant urges that Chambers' character was such as to negate reliability. Accordingly, he attacks the credibleness of the information imparted by Chambers to Officer Stewart on the basis of the informant's bad character. But the reliability of the informant is not paramount, nor is his credibility in issue with respect to the reasonable grounds for making the search or arrest. *People* v. *Dean*, 151 Cal.App.2d 165, 167 [311 P.2d 85] ; *People* v. *Weathers*, 162 Cal.App.2d 545, 546-547 [328 P.2d 222].) Only the credibility of the police officer is in issue. It is the credibility of the officer and the soundness of his reasons for relying on the informant

---

[2]Pedrico, who testified later in the case, stated that he was then serving time in San Quentin as the result of an arrest in October of 1960 and a conviction in November of 1960 for armed robbery. It is not clear from the record whether this is the same arrest to which Stewart was referring. In any event, the trial court was then considering the weight and credibility of Stewart's testimony in order to determine whether he was justified in relying on the informant.

which is the primary question. (*People* v. *Weathers, supra,* at pp. 546-547; *People* v. *Dean, supra,* at p. 167; *People* v. *Arter,* 169 Cal.App.2d 439, 442 [337 P.2d 534].) ▮ The weight to be accorded the information upon which the arresting officer acts is a question of fact for the trial court. (*People* v. *Weathers, supra,* p. 547; *Lorenzen* v. *Superior Court,* 150 Cal.App.2d 506, 510 [310 P.2d 180]; *People* v. *Gonzales,* 141 Cal.App.2d 604, 607 [297 P.2d 50].) ▮ "It is the officer's credibility and the soundness of his reasons for relying upon his informant that must impress the court before it can determine that the officer was authorized to make the arrest." (*People* v. *Dean, supra,* at p. 167.)

▮ Defendant likewise attacks the credibility of Officer Stewart and asserts that it was so " 'irreparably shaken' " as to deprive it of any credence. The basis of this assertion is a claimed inconsistency between his testimony and that of Chambers and Pedrico during the course of the trial. We need not repeat the alleged inconsistencies and contradictions because they are not pertinent to our inquiry here. The credibility with which we are here concerned is that of Officer Stewart on his *voir dire* examination before the trial court involving the admissibility of the evidence obtained as a result of the search and arrest without a warrant, and not his credibility as a witness before the jury as to the evidence given by him before the jury on the issue of defendant's guilt. ▮ ▮ The weight to be accorded the information upon which Officer Stewart and his fellow police officers acted in making the search and arrest of defendant was for the trial court's determination in the exercise of a sound discretion. (*People* v. *Gonzales, supra,* at p. 607; *Lorenzen* v. *Superior Court, supra,* at p. 510.) That discretion was not abused in the instant case. The testimony of Officer Stewart on the *voir dire* examination was worthy of belief and therefore sufficient to warrant the trial court's conclusion that the informant, Chambers, was reliable and that the police officers relied on the information received from him in making the search and arrest in question.

### Did the Trial Court Commit Prejudicial Error in Instructing the Jury on the Law Relating to Confessions?

▮ Defendant urges that it was prejudicial error for the trial court to instruct the jury on the law of confessions because there is no evidence that he ever confessed the crime with which he was charged. The trial court also instructed

the jury on admissions.[3] That it is error to instruct on the law of confessions, in the absence of proof thereof, is without question. (*People* v. *Wade*, 185 Cal.App.2d 226, 233 [8 Cal. Rptr. 197]; *People* v. *Nielson*, 183 Cal.App.2d 20, 28-29 [6 Cal.Rptr. 367].) ▮ "A confession is a voluntary statement that was made by one who is a defendant in a criminal trial, at a time when he was not testifying in that trial, by which he acknowledged certain conduct of his own that constituted a crime for which he is on trial, a statement which, if true, discloses his guilt of that crime and excludes the possibility of a reasonable inference to the contrary. (*People* v. *Speaks*, 156 Cal.App.2d 25, 34 [319 P.2d 709]; *People* v. *Ferdinand*, 194 Cal. 555, 568-569 [229 P. 341].) As said in *Ferdinand*, a confession "leaves nothing to be determined, in that it is a declaration of his [defendant's] intentional participation in a criminal act...." (Pp. 568-569; see *People* v. *Fitzgerald*, 56 Cal.2d 855, 861 [17 Cal.Rptr. 129, 366 P.2d 481].)

▮ In the case at bench the following testimony was given by Officer Stewart: "He [referring to defendant] told me that—specifically, that he had placed the paper bags under the seat of the car the night he was arrested. He stated that he was hoping the officers would overlook this marijuana because he had been lucky in San Pablo a couple of nights before. He had had contact with officers and was holding marijuana, and they had not noticed it. He stated that he knew as soon as the officers arrived at the Beacon Service Station, that he knew that the—to put it in his terminology—'the jig was up' when they come in there like gangbusters."

In the light of the foregoing principles, this purported statement of defendant is broad enough to comprehend every essential element necessary to make a case against him and thus amounts to a confession. It admits of all of the elements charged in the crime of possessing marijuana, i.e., the exercise of "dominion and control [by defendant] over the drug with knowledge of its presence and narcotic character." (*People* v. *Redrick*, 55 Cal.2d 282, 285 [10 Cal.Rptr. 823, 359 P.2d 255]; *People* v. *Jackson*, 198 Cal.App.2d 698, 704 [18 Cal.Rptr. 214].) Accordingly, the trial court was justified in instructing on the law of confessions.

### Was the District Attorney Guilty of Prejudicial Misconduct?

▮ Several instances of alleged prejudicial misconduct

---

. [3] It is not contended that, if applicable, the instructions on the definition and meaning of a confession were not proper in form or content.

on the part of the district attorney are asserted by defendant. The first specification relates to the cross-examination of the witnesses Pedrico[4] and Ferreira[5] purporting to impeach said witnesses by evidence of particular wrongful acts. No

[4]The pertinent cross-examination of Pedrico proceeded as follows: "Q. Mr. Pedrico, you state that you're in the State Prison for an armed robbery? A. Yes. Q. And that was for robbing a hospital, was it not? A. Yes. Q. And during the robbery the stealing of drugs? A. Yes. Q. Have you not also been convicted of another felony? A. Yes. Q. What was that? A. Armed robbery. Q. Where was that? A. Alameda County. Q. When was it? A. '54. Q. Mr. Pedrico, have you ever used heroin? A. Yes. Q. Were you using heroin in 1960? A. Yes. Q. Early 1960? A. Yes. Q. And by using it, did you take it intravenously? A. Yes. Q. As a matter of fact, you used to shoot into the left arm, isn't that so? A. And other places. Q. And other places. Fine. Thank you, Mr. Pedrico."

[5]The pertinent cross-examination of Ferreira proceeded as follows: "Q. (By Mr. Boatwright) And have you ever been convicted of a felony? A. Yes. Q. And what is the last felony you were convicted of, if more than one? A. Possession of marijuana. Q. Or cultivating or growing marijuana? A. I was sentenced to the State Prison for possession of marijuana. Q. Well, as a matter of fact, you were growing marijuana, were you not? A. That's true. Q. All right. And as a matter of fact, you had seeds that you planted to grow the marijuana, isn't that so? A. That's true. Q. And when were those seeds planted? A. I believe in February of '61. THE COURT: February, 1961? THE WITNESS: (Nodding) Q. (By Mr. Boatwright) And how big were the plants in August of 1961 when you were arrested? A. I couldn't righteously say. Q. Well, could you indicate to the Ladies and Gentlemen of the Jury? A. Oh, about—four feet high. Q. Four feet high. MR. BOATWRIGHT: (Showing photograph to Mr. Sanford) Q. (By Mr. Boatwright) Mr. Ferreira, I show you an eight by ten black and white photograph and ask you if you have ever seen this plant that appears right here, before? A. Yes, I have. Q. Where was that plant when you saw it growing? A. When I saw it growing? Q. Yes. A. It was in the backyard of my parents'—Q. Home? A. Yes. Q. How tall would you say that plant is? A. About two feet. Q. About two feet. And you had others that were taller than that, then. A. Yes, sir. THE COURT: Are you offering that in evidence, Counsel? MR. BOATWRIGHT: Yes, Your Honor, I believe I will, as People's next in order. MR. SANFORD: Your Honor, there's been no foundation laid as to who took it or where it came from or anything. MR. BOATWRIGHT: Well, he said he saw it before. THE COURT: Yes. Objection overruled. It may be received and marked People's Exhibit next in order in evidence. THE CLERK: Number five. (Whereupon the photograph above referred to was received in evidence and marked People's Exhibit No. 5.) THE COURT: And Counsel, before you proceed further, will you walk in front of the Jury and show them this exhibit that has just been offered in evidence? MR. BOATWRIGHT: Yes, Your Honor. THE COURT: And received in evidence. We must keep the Jury informed all the time. MR. BOATWRIGHT: (Exhibiting photograph to Jury) Q. (By Mr. Boatwright) Did you have any

objection to such examination was interposed by defendant. It is contended by defendant, however, that the asking of the subject questions by the prosecutor constituted prejudicial misconduct warranting a reversal notwithstanding the failure to object.

The Code of Civil Procedure (§§ 2051 and 2052) prescribes the method of impeaching witnesses, and they can be impeached in no way other than as therein provided. (*People* v. *Vanderburg*, 184 Cal.App.2d 33, 40 [7 Cal.Rptr. 287]; *People* v. *Harlan*, 133 Cal. 16, 20 [65 P. 9].) Accordingly, it is the statutory rule clearly declared by section 2051,[6] and recognized by numerous cases stating that the statute means precisely what is stated therein, that a witness may not be impeached " ' "by evidence of particular wrongful acts, except that it may be shown by the examination of the witness, or the record of the judgment, that he had been convicted of a felony." ...' " (*People* v. *Vanderburg, supra,* at p. 40; *People* v. *Adams,* 76 Cal.App. 178, 184 [244 P. 106].) Accordingly, in proving a felony conviction for impeachment purposes, the inquiry of the cross-examiner is limited to the fact of the conviction and the nature of the crime; he may not go into the details or circumstances surrounding the offense. (*People* v. *Braun,* 14 Cal.2d 1, 6 [92 P.2d 402]; *People* v. *Miller,* 188 Cal.App.2d 156, 170 [10 Cal.Rptr. 326].) The cross-examination here involved was clearly beyond the permitted limits. Our inquiry,

seeds in 1960—marijuana seeds in 1960? A. Yes. Q. Where did you get the seeds from? A. Found them. Q. You found them? A. (Nodding) Q. Where did you find them? THE COURT: Well, Counsel, I didn't hear the answer. Mr. Reporter, the pending question and answer. (Record read by Reporter) Q. (By Mr. Boatwright) Where did you find them? A. On Cowell Road. Q. What were they in when you found them? A. An envelope. Q. How big was the envelope? A. I—I don't recall. Q. What color was the envelope? A. White. Q. When did you find these seeds in the envelope on Cowell Road? A. On the way home from work one night. Q. Was that in 1959 that you found these the first time? A. No. Q. When was it? A. '61. Q. In '61? What month in '61? A. January. Either January or February. Q. An you immediately planted them. A. (Nodding) Q. Did you plant all the seeds that you found? A. (Nodding) THE COURT: Don't shake your head, please. A. Yes, sir. Q. (By Mr. Boatwright) As a matter of fact, when the officers came to your place in August, didn't they find more seeds there then? A. No. Q. What did you keep the seeds in when you had them? A. Same container. Q. Were they ever in a matchbox? A. No."

[6]All code references herein are to the Code of Civil Procedure unless otherwise indicated.

then, is directed to whether defendant can now complain of such misconduct on this appeal in view of the failure to properly raise this issue in the trial court. The answer is to be found in the principles set forth in *People* v. *Berryman*, 6 Cal.2d 331, 337 [57 P.2d 136], as follows: ''The general rule regarding misconduct of the district attorney which tends to and is likely to result in prejudice to the defendant is that where no objection is made to such misconduct by the defendant, or where objection is made and the court sustains the objection and properly admonishes the jury, the misconduct claimed to be prejudicial to defendant's rights will not furnish grounds sufficient to justify the granting of a new trial or the reversal of the judgment. [Citation.]

 There are two exceptions to this general rule. One is where the case is closely balanced and there is grave doubt of defendant's guilt, and the acts of misconduct are such as to contribute materially to the verdict, a miscarriage of justice results requiring a reversal. [Citation.] The other exception is where the act done or remark made is of such a character that a harmful result cannot be obviated or cured by any retraction of counsel or instruction of the court. In such cases the misconduct will furnish ground for a reversal of the judgment, even where proper admonitions are given by the court. [Citations.]'' (See also *People* v. *Perez*, 58 Cal.2d 229, 247 [23 Cal.Rptr. 569, 373 P.2d 617]; *People* v. *Lyons*, 50 Cal.2d 245, 262 [324 P.2d 556]; *People* v. *Kirkes*, 39 Cal. 2d 719, 726-727 [249 P.2d 1]; *People* v. *Basler*, 217 Cal. App.2d 389, 399 [31 Cal.Rptr. 884].) ''Whether a prosecutor has been guilty of prejudicial misconduct must be determined in the light of the particular factual situation involved.'' (*People* v. *Lyons, supra*, at p. 262.)

 It is not contended by defendant that the instant case falls within the purview of either of the exceptions. It is clear that it is not a close case where there is grave doubt of defendant's guilt. The evidence clearly establishes that defendant was in possession of marijuana. It was found in the automobile which he was driving and traces were also found in his clothing. Moreover, he confessed to possessing the marijuana found in the car. It is also clear that a prompt objection to the questions would doubtless have cut off any of those going beyond the permissible limits of cross-examination.

 The next contention of defendant as to the district attorney's alleged misconduct is with reference to the recross-

examination of defendant regarding his confinement in certain penal institutions.[7] It is asserted that the question concerning the federal reformatory at El Reno had reference to the conviction for a misdemeanor and therefore was improper. While it is a correct statement of the law that a witness may not be impeached by showing that he has been convicted of a misdemeanor (*People* v. *Hamilton*, 33 Cal.2d 45 [198 P.2d 873]; § 2051), the record is barren as to the nature of the conviction for which defendant was sentenced to the reformatory. If the prosecutor's purpose was to impeach defendant by showing that he was convicted of a felony the proper procedure, as we have hereinabove discussed, was to ask defendant if he had been convicted of a felony, and, if the answer was in the affirmative, to inquire as to its nature. It appears, however, that the evidence of defendant's imprisonment was not presented by the district attorney in the first instance. Evidence had been presented at the trial by the prosecution through the testimony of Officer Stewart of his conversation with defendant, at the time of the latter's arrest, concerning defendant's familiarity with the marijuana plant and its sale as a narcotic. Thereafter, in order to impress the trier of the facts that defendant did not gain this familiarity with narcotics through personal indulgence, the defense sought to show that the knowledge was gained while defendant was in the penitentiary. On direct examination defendant was asked by his own counsel how long he had been in a federal prison; and, on redirect examination, defendant stated that what he knew about narcotics was learned in a federal institution. The questioned recross-examination then ensued. This was legitimate cross-examination within the purview of the direct examination. ▇
It is well established that cross-examination may embrace questions which tend to rebut the testimony of a witness on his direct examination, even though it does not relate to the principal issue. (*People* v. *Phillips,* 197 Cal.App.2d 159, 162 [17 Cal.Rptr. 301]; *People* v. *Dotson,* 46 Cal.2d 891, 898 [299

---

[7]The examination complained of is as follows: "What was the first reformatory you went to? A. El Reno. Q. That's El Reno, Oklahoma, isn't it? A. That's correct. Q. Federal reformatory? A. (Nodding) Q. Where were you transferred after that? A. McNeil Island. Q. McNeil Island, Washington? A. That's right. Q. And when were you convicted of violation of the Dyer Act? A. In April. Q. Of what year? A. Of 1957. Q. When were you released from Federal prison? A. That was in May that I was convicted and in May that I came out in 1961. Q. And are you presently on parole? A. I am."

P.2d 875].) The scope of proper cross-examination may extend to the whole transaction of which the witness has testified, or it may be employed to elicit any matter which may tend to overcome, qualify or explain the testimony given by a witness on his direct examination. (*People* v. *Dotson, supra*, p. 898.) ▌ Moreover, defendant did not object in the trial court to the said cross-examination. Assuming *arguendo* that the cross-examination complained of constituted misconduct, it would not warrant a reversal of the judgment for the reasons hereinabove discussed with respect to the principles applicable where no objection is made to such misconduct in the court below.

Several other instances of claimed misconduct on the part of the district attorney are urged on the basis that his cross-examination related to questions which suggested facts which could not be proved and which were harmful to defendant merely because they were asked. ▌ The applicable rule is to the effect that it is improper to ask questions which clearly suggest the existence of facts which would be harmful to the defendant, in the absence of a good faith belief by the prosecutor that the questions would be answered in the affirmative, or with a belief on his part that the facts could be proved, and a purpose to prove them, if their existence should be denied. (*People* v. *Perez, supra*, 58 Cal.2d 229, 240-241; *People* v. *Lo Cigno*, 193 Cal.App.2d 360, 388 [14 Cal.Rptr. 354].) The first of these instances involves the cross-examination of defendant's sister, who was asked the following question on cross-examination by the district attorney: "Do you recall saying to him,[8] words to this effect, 'I thought you said guys at the top never got caught,' and his answer to this effect, 'They don't,' and you said, 'Well, what are we doing in here?' Do you recall that?" To this question the witness replied: "No, I don't, but it's cute." The second instance concerns the cross-examination of defendant wherein he was asked, after testifying on direct examination that he was known by the nicknames "Tim" and "Timmy," whether he was known by the nicknames "Rockie" and "Grasshead." Defendant replied in the negative. In the third instance defendant was asked the following question to which he answered in the negative: "Were you making a delivery for Mr. Cole?"[9] No attempt

[8]Referring to her brother, the defendant.
[9]The automobile which defendant was driving at the time of his arrest was owned by a person named Cole.

was made by the prosecution to prove the facts assumed in these questions.

We fail to see any harm in the prosecutor's cross-examination of defendant suggesting that he was known by the nicknames of "Rockie" and "Grasshead." Defendant merely makes the assertion that this questioning had the effect of degrading him in the eyes of the jury. It requires a stretching of the imagination to attach a derogatory connotation to the name "Rockie." As for the name "Grasshead," the connotation appears to be uncomplimentary rather than degrading. Moreover, impeachment evidence which tends to degrade the witness is not per se objectionable or improper. To the contrary, such may be the result of legitimate impeachment. It is only when it is sought to impeach the witness in a manner not countenanced by the statutes (§§ 2051, 2052) that the impeachment is proscribed.

Accordingly, the subject questions were improper if their purport was to impeach by evidence of bad character in a manner not provided for in section 2051. That section permits impeachment of a witness for bad character by two methods only: (1) by evidence that his general reputation for truth, honesty and integrity is bad; and (2) by evidence that he has been convicted of a felony. As we have hereinabove pointed out, except for the showing of a conviction for a felony, the witness may not be impeached by evidence of particular wrongful acts. In construing section 2051 the reviewing courts have held that, in the absence of special circumstances, it is improper, over objection, to question a witness about the claimed use of an assumed name. (*People* v. *Guiterrez*, 152 Cal.App.2d 115, 120 [312 P.2d 291]; *People* v. *Buyle*, 22 Cal.App.2d 143, 150-151 [70 P.2d 955]; *Stickel* v. *San Diego Elec. Ry. Co.*, 32 Cal.2d 157, 165 [195 P.2d 416]; *People* v. *Fleming*, 166 Cal. 357, 381 [136 P. 291, Ann.Cas. 1915B 881]; *People* v. *Mohr*, 157 Cal. 732, 734-735 [109 P. 476].) If, however, there is an issue or dispute as to a witness' true name such questioning is proper. (*People* v. *Mohr, supra*, pp. 734-735; *People* v. *Williams*, 72 Cal.App. 52, 55 [236 P. 355].) The rationale of the cases, except where the exception is applicable, is that evidence of an assumed name is not conducive to a good character for the witness. We are not aware of any cases, nor have any been cited, which have applied this rule to nicknames. At first blush it would appear that there is a marked difference between a name which a person assumes and a

nickname. The latter is usually given to a person by others. We can apprehend, however, that a nickname may be so degrading as to connote the bad character of the person so named or commission by him of a wrongful act so as to bring the "assumed name" rule into play. In the case at bench, assuming *arguendo* that the nicknames in question tend to degrade, there are two circumstances which preclude the application of the impeachment rule in question. In the first place, the subject of defendant's nickname was opened up and inquired into by defendant's counsel on direct examination. Secondly, no objection was interposed to the district attorney's questions. Accordingly, we cannot see how defendant can now complain. Nor can we say, under the circumstances, that there was an absence of a good faith belief on the part of the prosecution that the subject questions would be answered in the affirmative.

 The question as to whether defendant was making a delivery for Mr. Cole was not objected to by defendant. What we have heretofore said concerning the applicable principles where there is a failure to object also applies here. Moreover, we cannot say in the light of the record that the question was improper. While it may not be said that the prosecutor did not anticipate a negative answer because of defendant's denial on direct examination of any knowledge of the presence of marijuana in the Thunderbird, which he had borrowed from Cole, the conclusion is not warranted that the district attorney was acting in bad faith in view of Officer Stewart's testimony, already in the record, to the effect that defendant had told him, the day following the arrest, that he had placed the paper bags under the seat of the car the night he was arrested, and that if Stewart had waited a little longer he "could have got some of the boys above him."[10]

 The implication to be drawn from the question put to defendant's sister is obvious. Following the negative reply to the question, no attempt was made to rebut the answer or to present evidence showing that the district attorney had a basis to believe that the statement could be proved. Accordingly, the question was improper and constituted misconduct.

---

[10] Officer Stewart testified as follows: "He told me that if I had been a little more patient and waited about another month in my observance of his activities that I would have been able to really make a good haul, I probably could have got some of the boys above him."

The question was not objected to, however, and, as we have pointed out above, this is not a closely balanced case in which there is a grave doubt of defendant's guilt so as to bring it within the first exception to the general rule that the prosecutor's misconduct does not warrant a reversal of the judgment where there has been no objection in the trial court. Nor does this situation fall within the second exception since a prompt objection to the question and a proper admonition of the court or retraction by the prosecutor would have obviated any harmful result insinuated by the question. Such misconduct, moreover, has not resulted in a miscarriage of justice. We are of the opinion, after an examination of the entire cause, that it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error occasioned by this instance of misconduct. (See *People* v. *Watson*, 46 Cal.2d 818, 835-838 [299 P.2d 243].)

▉▉ Misconduct on the part of the district attorney is also asserted with regard to a tape recording used on rebuttal testimony. Defendant, while being cross-examined by the prosecutor, admitted that he had told Officer Stewart that he had some marijuana plants growing on Mount Diablo. Thereafter, on rebuttal, the prosecution sought to introduce into evidence, for purposes of impeachment, certain portions of a tape recording of a conversation between Officer Stewart and defendant the day following the arrest. Defendant objected to the playing of portions of the tape and requested of the court that in view of the inaudibility of portions of the recording that it be transcribed and the entire transcription be read to the jury. The trial court acceded to the request. When the trial resumed the district attorney offered the entire transcription into evidence, to which offer counsel for defendant stated that he had no objection. The transcript was thereupon admitted into evidence. The prosecutor read portions of it to the jury, including a portion wherein defendant stated to Officer Stewart that he had some plants growing on Mount Diablo. Defendant now asserts that it was prejudicial misconduct on the part of the district attorney to read defendant's statement from the transcription relative to the growing of marijuana on Mount Diablo because defendant had already admitted making such a statement on cross-examination. Defendant relies upon the rule that where the witness upon cross-examination admits to making statements out of court inconsistent with his evidence upon the trial it is

error to introduce other evidence of them. (See *People* v. *Perez*, 189 Cal.App.2d 526, 536-537 [11 Cal.Rptr. 456]; *People* v. *Flores*, 37 Cal.App.2d 282, 287 [99 P.2d 326].)[11] In the case at bench, however, the rule was obviated by defendant's insistence that the tape be transcribed in its entirety and by what amounted to a stipulation that the entire transcription be admitted into evidence. Upon becoming an exhibit in the case any portion thereof could be read to the jury. Moreover, counsel for defendant stipulated that any exhibit received in evidence during the trial could, upon request of the foreman of the jury, be brought into the jury room by the bailiff. Accordingly, defendant is now in no position to argue that it was misconduct to read the questioned portion of the transcription to the jury. These conclusions are likewise applicable to the portion of the transcript relating to the conversation between Officer Stewart and defendant concerning the smoking by defendant of marijuana at his sister's house. The claimed error in admitting this statement without the required foundation,[12] in view of defendant's statement on cross-examination that he did not recall making the statement,[13] was averted when the transcription was admitted into evidence without objection. The failure to object at all waived the defect. (*Perry* v. *McLaughlin*, 212 Cal. 1, 6 [297 P. 554]; *Robison* v. *Superior Court*, 49 Cal.2d 186, 187 [316 P.2d 1]; *People* v. *Prado*, 190 Cal.App.2d 374, 378 [12 Cal.Rptr. 141].) Moreover, it is a well known maxim of jurisprudence that acquiescence in error takes away the right of objecting to it. (Civ. Code, § 3516; *Buchanan* v. *Nye*, 128 Cal.App.2d 582, 587 [275 P.2d 767].)

Finally, it is asserted by defendant that the district attorney was guilty of prejudicial misconduct in giving statements to a local newspaper. The portion of the article that is alleged to have prejudiced defendant is a statement attributed by the local newspaper to the district attorney

[11]At the trial defendant testified on direct examination that he did not have some plants growing on Mount Diablo.

[12]Such foundation is laid by relating to the witness the statement with the circumstances of times, places, and persons present; and by asking him whether he made such statement; and, if so, by allowing him to explain it. (§ 2052; see *People* v. *Sweeney*, 55 Cal.2d 27, 37 [9 Cal.Rptr. 793, 357 P.2d 1049].)

[13]On cross-examination defendant had testified that he did not recall telling Officer Stewart that he had smoked ''pot'' (marijuana) at his sister's house.

who prosecuted the instant case. The subject article, which was published during the course of the trial, quoted the prosecutor as stating that the testimony of the defense witness Pedrico actually was corroboration of the prosecution's evidence and that the testimony of the defense witness Ferreira was more damning than beneficial to defendant's case. The article also stated that Officer Stewart had testified that defendant said he would "cost the State some money" and then quoted the prosecutor as stating that "So far ... the Jury has done just that." Defendant made a timely motion for a mistrial on the basis of the article. The court below denied the motion for a mistrial, but admonished the jury forthwith that they were not to read anything in the newspapers about the trial of the action and that if they had read anything they must disregard it as well as what they may have heard someone say on the outside.

It is not denied that the prosecutor made the statements attributed to him by the newspaper, but it is contended by respondent that they represented "fair comments proper on oral argument to the jury."[14] This contention is tenuous. We are not here concerned with the propriety of the prosecutor's argument to the jury, which incidentally had not yet been made, but rather with the propriety of the comments made by the prosecutor himself to the newspaper during the course of the trial. ▮ As stated in *People* v. *Brommel,* 56 Cal.2d 629, 636 [15 Cal.Rptr. 909, 364 P.2d 845]: "Prosecuting officers owe a public duty of fairness to the accused as well as to the People and they should avoid the danger of prejudicing jurors and prospective jurors by giving material to news-disseminating agencies which may be inflammatory or improperly prejudicial to defendant's rights." ▮ The function, duty and obligation of the prosecutor is succinctly stated by Justice Tobriner in *People* v. *Franklin,* 194 Cal.App.2d 23 [14 Cal.Rptr. 375], as follows: "The role of the prosecution far transcends the objective of high scores of conviction; its function is rather to serve as a public instrument of inquiry and, pursuant to the tenets of the decisions, to expose the facts. To the extent that the prosecution departs from these purposes we believe that it creates unnecessary difficulties in the administration of justice." (Pp. 29-30.) ▮ In the light of these admonitions the prose-

---

[14]It should be here noted that the prosecutor himself, at the time the motion for mistrial was argued, justified the article on the basis of fair newspaper comment.

cutor's comments to the press were improper because they were capable of improperly influencing the jurors who might read the article in question. To warrant a reversal, however, defendant must show that the publication had a prejudicial effect. (*People* v. *Carter*, 56 Cal.2d 549, 572 [15 Cal.Rptr. 645, 364 P.2d 477]; *People* v. *Santo*, 43 Cal.2d 319, 331 [273 P.2d 249]; *People* v. *Gomez*, 41 Cal.2d 150, 161 [258 P.2d 825].) In the instant case the only showing made by defendant was the reading of the article to the trial judge outside of the presence of the jury during the argument on the motion for a mistrial. There was no showing made that any of the jurors had read or seen the article or that it had been conveyed to them in any manner. Moreover, the jury was properly admonished to disregard whatever they might read in the newspapers and to decide the facts only upon the evidence presented in court. ■ We must presume, in the absence of an actual showing of prejudice, that the jury properly heeded the admonishment. (*People* v. *Gomez, supra,* at pp. 161-162; *People* v. *Santo, supra,* at p. 331.)

*Was the Trial Court Guilty of Prejudicial Misconduct?*

The alleged misconduct of the trial judge is asserted to consist of the following: reemphasis of adverse testimony; limiting of defendant's cross-examination of witnesses; special assistance to the district attorney; and the putting of defense counsel in a compromising position before the jury. ■ It should be noted here that no objection or assignment of error was made to the trial court's conduct during the course of the trial. The principles applicable to the waiver attendant to the failure to object hereinabove alluded to are also applicable here. Moreover, the record is devoid of any conduct which would bear out defendant's contentions.

■ Relative to the charge that the trial court unduly reemphasized testimony damaging to him, defendant cites nine instances.[15] Of these, five involved the repetition of slang expressions (generally unfamiliar to the average layman), which the trial court caused to be repeated for the edification of the jury, and, apparently, its own.[16] Three of the specifi-

---

[15]The reporter's transcript in the present case discloses that the trial consumed four days and that there are approximately 430 pages of testimony.

[16]Two of these were used by defendant's counsel in his interrogation i.e., "higher than a kite" and "hard stuff"; one was the reference to the nickname "Rockie," by the prosecutor; and the other two expressions were the following: the words "'pissed off'" used by Officer

cations clearly occurred under circumstances which indicate that the trial court encountered acoustical difficulties and involved testimony which could hardly be categorized as "damaging."[17] The remaining item obviously involves a situation where the trial judge was attempting to ascertain whether the witness Stewart was giving his own conclusion or whether he was repeating what defendant had stated to him.[18]

Tamborski in narrating a statement made by defendant to him; and the words "messing around" used by defendant himself while testifying.

[17] Cross-examination of Officer Stewart by defendant's counsel: "Q. Well, do you remember having her stripped and searched? A. Yes, I had this same police matron search her. THE COURT: Did you say stripped and searched? Is that what you said? MR. SANFORD: Right. THE COURT: Was she stripped and searched? THE WITNESS: I had the police matron search her, Your Honor. I am not aware of the exact type of search that took place. THE COURT: All right."

Cross-examination of defendant's sister, Louise Kay Swayze: "Q. Now, on the date of January 17th, 1962, when you were in the cell across from your brother, you had a conversation with him, didn't you? A. Yes. Q. Do you recall saying to him, words to this effect, 'I thought you said guys at the top never got caught,' and his answer to this effect, 'They don't,' and you said, 'Well, what are we doing in here?' Do you recall that? A. No, I don't, but it's cute. Q. Pardon me? A. I said I don't recall that at all. Q. Didn't you make that statement to him? A. I don't recall; no, I don't. THE COURT: Madam Reporter, let's have the two preceding questions and answers. (Thereupon, the following testimony was read by the Reporter: 'Question: Do you recall saying to him, words to this effect, "I thought you said guys at the top never got caught," and his answer to this effect, "They don't," and you said, "Well, what are we doing in here?"' Do you recall that? 'Answer: No, I don't, but it's cute.' THE COURT: Well, that's what I wanted to get. All right, proceed."

Cross-examination of defendant's witness Marcia Gilman: "Q. Where is your husband? A. He's out of town. Q. Is he working out of town? A. No. Q. Well, out of town. Where do you mean specifically? A. He's in Seattle. Q. In Seattle. A. Yes. Q. What's his address in Seattle? A. 1004 County City Building. Q. Pardon me? A. County City Building. Q. County City Building. A. Yes. Q. Is he employed by the county or city of Seattle or the county there? A. No. He's in jail. Q. Oh, he's in jail there. A. (Nodding) Q. I see. THE COURT: He's what? THE WITNESS: In jail."

[18] "A. After he had stated something to the effect that this was the off season for growing marijuana, he did proceed to describe the proper cure for smoking purposes of marijuana, also the desired climates for growing this plant. Q. What are those desired climates that he told you about? A. Well, I believe you have to have good hot sun. THE COURT: Is that what he said? THE WITNESS: Yes, sir. This is the— good hot sun; plenty of water, and a kind of a sandy loam to grow a good plant. He also commented on the Concord Police Department train-

▮ Defendant next complains that the trial court unduly limited his cross-examination. A perusal of the record discloses that defendant was not restricted in his cross-examination but merely that the trial court admonished him on one occasion "to keep [the cross-examination] within reasonable limits" and on another to confine his recross-examination to "the scope of the redirect in the interest of time."[19] Under the claim of "restricted cross-examination" defendant complains of an incident which was clearly brought about by his counsel's own impropriety. During a colloquy in connection with an objection by the district attorney the trial court observed: "I think you have already gone into it *in extenso,* haven't you, Counsel?" To this question counsel for defendant made the nonresponsive and contumacious reply "I have cross-examined for what, five minutes?" After being told that it was not incumbent upon the court to reply to such a question the court said "All right, proceed. What is your question?" It is apparent that there was no restriction imposed upon the examination. Nor is the question of restricted examination involved on the occasion in which the court admonished *both* counsel to "quicken the tempo of the questioning." ▮▮ It is not only the duty of the trial judge to restrict the cross-examination to reasonable limitations (see *People* v. *Barragan,* 163 Cal.App.2d 625, 629 [329 P.2d 733] ; *People* v. *Hambrick,* 162 Cal.App.2d 239, 244 [327 P.2d 570]), but the "trial court has a clear duty to supervise the conduct of the trial to the end that it may not be unduly protracted and that other litigants too may have their day in court." (*Sullivan* v. *Dunnigan,* 171 Cal.App.2d 662, 670 [341 P.2d 404].) ▮ The control of cross-examination is within the discretion of the trial court and in the exercise of this discretion the court may confine cross-examination within reasonable limits and may curtail cross-examination which relates to matters already covered, or which are irrelevant. (*People* v. *Simpson,* 203 Cal.App.2d 368, 372 [21 Cal.Rptr. 541] ; *Sullivan* v. *Dunnigan, supra,* at p. 670.) Only a manifest abuse of the court's discretion will warrant a reversal (*Sullivan* v. *Dunnigan, supra,* at p. 670; *People* v. *Simpson, supra,* at p. 372),

---

ing leaflet that is put out on marijuana. He commented that he would like to rewrite it for us because it really wasn't correct."

[19]The last admonition was also directed on one occasion to the district attorney.

and no such abuse is disclosed by the record in the case at bench.

The instance of alleged special assistance to the district attorney took place when the trial judge examined the prosecution's narcotics expert relative to his qualifications as an expert by asking additional questions to those interposed by the prosecutor. The mere fact that a judge examines a witness does not establish misconduct. (*People* v. *Corrigan*, 48 Cal.2d 551, 559 [310 P.2d 953].) A trial judge has the right to examine witnesses, and such examination may not be assigned as error on appeal where no objection was made when the questioning occurred. (*People* v. *Corrigan*, *supra*, at pp. 555-556; *People* v. *Peters*, 191 Cal.App.2d 581, 585 [12 Cal.Rptr. 745].) Defendant also objects (for the first time on appeal) that the trial court took upon itself and away from counsel the impeachment of Officer Tamborski. This is not reflected in the record.[20] The trial court aided rather than impeded defendant's counsel. Likewise, the instance complained of where the trial court examined a character witness for defendant was clearly an aid to defendant. Defense counsel propounded the question: "[H]ave you ever heard of the reputation of the defendant?", whereupon the district attorney interposed an objection. Worded in this form the question was improper as calling for hearsay. Without ruling on the objection the court worded the question to the witness in its proper form, to wit:

[20]"THE COURT: You are referring to transcript of testimony taken before the Grand Jury, Mr. Sanford? MR. SANFORD: That is correct. I have the transcript here, and I ask the officer to read—THE COURT: No, you keep that in your hand. The Court has the original. You give me the page and lines. MR. SANFORD: The page is page 6, line 6 down to line 10. THE COURT: Now, Officer—Well, Counsel, that is not the completion of the question propounded on line 6. Do you want to include down to line 14, which will include the second paragraph of the answer to the question on line 6? MR. SANFORD: Well, I don't see there's any need to. I'm not interested—THE COURT: Well, I know, but we want the whole answer. MR. SANFORD: All right, put the whole answer in. THE COURT: Very well. Now, Officer, read to yourself from line 6 on page 6 of the transcript of testimony taken before the Grand Jury, down to and including line 14 on that same page. Take your time, and then counsel will propound certain questions to you. THE WITNESS: (Reading transcript.) THE COURT: You may proceed, Counsel. BY MR. SANFORD: Q. You were asked that question, 'And what was this information?' and you gave that answer? A. Yes, sir. MR. SANFORD: May I read the answer? THE COURT: Counsel, start off with question. MR. SANFORD: 'Question: And what was this information? ...'"

" 'Do you know the reputation of the defendant in this community for the particular trait involved in this action?' "

 The final alleged instance of prejudicial misconduct on the part of the trial court is alleged to have occurred when the trial court continued the trial in order to have the tape recording of the conversation between defendant and Officer Stewart, hereinbefore referred to, transcribed. This transcription was at defendant's request and resulted in a continuance from Friday to the following Tuesday. The trial court explained to the jury that because of its calendar it could not preside over the case on the following Monday and apologized to counsel for this circumstance. Defendant claims that this postponement at his request occurring in the presence of the jury placed him in the role of obstructing the case and hence in a bad light in the eyes of the jury. Defendant makes the assertion but offers no showing to substantiate it. It is incumbent upon him to do so, and having failed to so do, he cannot urge prejudicial misconduct.

*Did the Trial Court Commit Prejudicial Error in Permitting Testimony of What was Heard on a Tape Recording Rather Than Requiring the Production of the Tape Recording Itself?*

 The answer to this question depends on whether the testimony in question was from memory of what *transpired* during the questioning, or whether the testimony was of *what* the witness *heard* on the recording. When one testifies as to what he has seen or heard his testimony is primary evidence whether or not the same matter is incorporated in a sound recording. (*People* v. *Sweeney*, 55 Cal.2d 27, 38 [9 Cal.Rptr. 793, 357 P.2d 1049] ; *People* v. *Sica*, 112 Cal.App.2d 574, 588 [247 P.2d 72] ; *People* v. *Davis*, 210 Cal.App.2d 721, 738 [26 Cal.Rptr. 903].) In the instant case, Officer Stewart, who had interrogated defendant at the police station after the latter's arrest, was called as a witness to testify as to statements then made by defendant. After testifying for some time it developed that the witness was referring to a transcription of a tape recording. Upon being queried by the trial court as to whether he was refreshing his memory of the conversation and as to whether the witness could give the conversation without the aid of any notes, the witness replied in the affirmative and then proceeded to testify without reference to the transcription.[21] It appears from the record that

---

[21]The colloquy which developed is as follows: "MR. SANFORD: [Counsel for defendant] Your Honor, could I ask what the witness is

the witness acceded to the trial court's request and testified, not as to what the recording contained, but as to what defendant had said because the witness heard it. Under these circumstances the best evidence rule was not violated.

The judgment is affirmed.

Bray, P. J., and Sullivan, J., concurred.

---

reading from? THE WITNESS: Yes, I'm—BY MR. BOAT-WRIGHT: [District attorney] Q. Yes, go ahead. A. This is from a tape recording of this conversation and I was going right down the line from this tape recording made of this conversation. MR. SANFORD: Where is the tape recording? THE WITNESS: The District Attorney has it now. MR. SANFORD: Wouldn't that be the better evidence here of what occurred, Your Honor? Why do we accept a transcript when we could have the original recording of this conversation? MR. BOATWRIGHT: We're not taking a transcript, Your Honor. This is testimony. THE COURT: This is testimony. Mr. Witness, are you just refreshing your memory in this way? THE WITNESS: Yes, I am, Your Honor. THE COURT: Can you give us the conversation without the aid of any notes? THE WITNESS: Well, this is just in sequence, Your Honor, of the tape. THE COURT: Never mind about the sequence, but can you just tell us what you remember of it? THE WITNESS: Yes, I could. THE COURT: Remember about it? THE WITNESS: I had rather refer to the notes, but if you desire, Your Honor, I will try to generalize. THE COURT: You do that, won't you?"